UNITED STATES ET AL. *v.* LOWDEN ET AL., TRUS-
TEES OF THE ESTATE OF THE CHICAGO, ROCK
ISLAND & PACIFIC RAILWAY CO., ETC.

No. 343.   Argued November 6, 1939.—Decided December 4, 1939.

226

*Mr. James C. Wilson,* with whom *Solicitor General Jackson, Assistant Attorney General Arnold,* and *Messrs. Elmer B. Collins, Richard H. Demuth, Daniel W. Knowlton,* and *Edward M. Reidy* were on the brief, for appellants.

*Mr. W. F. Peter,* with whom *Messrs. Otis F. Glenn* and *M. L. Bell* were on the brief, for appellees.

By leave of Court, *Messrs. Frank L. Mulholland, Clarence M. Mulholland,* and *Willard H. McEwen,* on behalf of the Railway Labor Executives' Association, filed a brief, as *amici curiae,* urging reversal.

Mr. Justice Stone delivered the opinion of the Court.

This appeal raises the question whether the Interstate Commerce Commission, in approving and authorizing a lease of a railroad by one railroad company to another, under § 5 (4) (b) of the Interstate Commerce Act as amended, (48 Stat. 217, 49 U. S. C., § 5 (4) (b) enacted in substance as § 407 (5) (6) of the Transportation Act of 1920, 41 Stat. 481), has authority to prescribe as a condition of its order, that certain employees of the lessor shall receive partial compensation for the loss which they may suffer, by reason of their discharge or transfer as a result of the lease.

Appellees are trustees of the Chicago, Rock Island & Gulf Company and of the Chicago, Rock Island & Pacific Railway Company, both in bankruptcy for purposes of reorganization under § 77 of the Bankruptcy Act. They applied to the Interstate Commerce Commission for authority under § 5 (4) (b) to lease the railroad and properties of the Gulf Company to themselves as trustees of the Pacific Company at an annual rental equal to the net operating income of the leased property. On the application, which was twice heard by the Commission, evidence was submitted from which the Commission found that the Gulf Company, whose entire capital stock is owned by the Pacific Company, is owner of six hundred and thirty-two miles of railroad in Texas which it operates separately from the 8,138 miles of railroad of the Pacific Company; that the purpose of the proposed lease was to combine the operation of the two lines in order to effect savings in operating costs through the elimination of the Texas accounting offices of the Gulf Company.

The Commission found that the lease would not impose upon the public any change in conditions affecting

train operation; that it would have no effect on rates or routes and would result in no change of service to the public. It found that the-elimination of the Texas accounting offices would result in an annual saving of $100,-000, six or seven thousand dollars of which would accrue to the Gulf Company and the remainder to the Pacific Company, to be effected through the ultimate dismissal of forty-nine of the Gulf accounting employees and the transfer of twenty others to the Chicago offices of the Pacific Company. The Commission also found that the welfare of the employees affected by the elimination of the accounting office is one of the matters of public interest which the Commission must consider in proceedings under § 5 (4) (b).

It accordingly authorized the lease upon the conditions which it found to be just and reasonable: that for a period not exceeding five years each retained employee should be compensated for any reduction in. salary so long as he is unable, in the exercise of his seniority rights under existing rules and practices to obtain a position with compensation equal to his compensation at the date of the lease; that dismissed employees unable to obtain equivalent employment be paid partial compensation for the loss of their employment in specified amounts and for specified periods depending on the length of their service, and that the transferred employees be paid their traveling and moving expenses including losses incurred through being forced to sell their homes. The maximum cost of compliance with the conditions, it was found, would be $290,000 spread over a period of five years, during which the savings effected by the lease would be not less than $500,000. The Commission found that the proposed lease, with the specified conditions "will be in harmony with and in furtherance of. our plan for the consolidation of railroad properties and will promote the public interest."

In the present suit, brought by appellees, the district court of three judges (Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 219, 28 U. S. C., §§ 45, 47a), granted the relief sought, and decreed that the conditions of the Commission's order be set aside and that the Commission be enjoined from enforcing them. The case comes here on appeal under § 238 of the Judicial Code, 28 U. S. C., § 345.

Appellees contend, as the district court held, that the Commission was without the authority of any act of Congress to attach the prescribed conditions to its order. Consequently, they argue that the courts may appropriately set them aside as of no effect, leaving the remainder of the order to stand as the Commission's unqualified approval of the lease, although the Commission gave no indication that it would have authorized the lease without the conditions.

Section 5 (4) (a) provides that "it shall be lawful, with the approval . . . of the Commission, as provided in subdivision (b), for two or more carriers to consolidate or merge their properties . . . or for any carrier . . . to . . . lease . . . the properties . . . of another . . ." Subdivision (b) provides that the Commission on application by the carrier or carriers concerned may, after hearing, authorize such a consolidation or lease, and directs that "if after such hearing the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation . . . [or] lease . . . will be in harmony with and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3), and will promote the public interest, it may enter an order approving . . . such consolidation . . . [or] lease . . . upon the terms and conditions and with the modifications so found to be just and reasonable."

In *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, we pointed out that the phrase "public interest" in this section does not refer generally to matters of public concern apart from the public interest in the maintenance of an adequate rail transportation system; that it is used in a more restricted sense defined by reference to the purposes of the Transportation Act of 1920, of which the section is a part and which, as had been recognized in earlier opinions of this Court, sought through the exercise of the new authority given to the Commission to secure a more adequate and efficient transportation system. See *New England Divisions Cases,* 261 U. S. 184; *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456; *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.,* 270 U. S. 266, 277. Thus restricted, the term public interest "as used in the statute, is not a mere general reference to public welfare but as shown by the context and purposes of the Act has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency and to appropriate provision and best use of transportation facilities." *Texas* v. *United States,* 292 U. S. 522, 531.

Appellees do not challenge the Commission's contention that the conditions are germane to the transaction involved in the lease because the purpose of the conditions is to mitigate the direct effect of the lease upon the employees. See *United States* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 311, 324, 339, 340. But they insist that the conditions which the Commission is permitted by this section to attach to its order must also conform to the standard of public interest which the statute sets up to guide the Commission's action. From this premise they argue that the prescribed conditions are unauthorized because unrelated to the public interest in its statutory sense. They maintain that a carrier's employees, as such, are

not part of the public whose interest is to be promoted by the lease, and that their interest in keeping their employment without loss of compensation is of private concern and no part of that public interest in the maintenance of an adequate and efficient transportation system which the statute contemplates.

Accepting the premise, as we may for present purposes, without considering the contention of the Commission that the conditions if just and reasonable, need not be related to the other statutory standards, the issue is narrowed to a single question whether we can say, as matter of law, that the granting or withholding of the protection afforded to the employees by the prescribed conditions can have no influence or effect upon the maintenance of an adequate and efficient transportation system which the statute recognizes as a matter of public concern.

Appellees do not attack the sufficiency of the evidence on which the Commission's findings are based, and that evidence was not submitted to the district court for review. Hence we are free to disturb the findings only if we can say that there can be no rational basis for them. *Mississippi Valley Barge Line Co.* v. *United States,* 292 U. S. 282; *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 304; *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 146. Appellees do not deny that the use of part of the savings resulting from the lease to compensate the employees for the loss which it will occasion, is just and reasonable so far as the interest and relations of employer and employee are concerned; or that the lease will be in harmony with and further the Commission's plan for consolidation of the railroads as the Commission found. They urge only that the conditions imposed can have no relationship to the maintenance of an adequate and efficient transportation system

and in consequence cannot in any circumstances be said to promote the public interest in the statutory sense.

The proposed lease in its relation to the transfer or dismissal of employees and to an adequate and efficient transportation system, is not to be viewed as an isolated transaction or apart from the Commission's plan for consolidation of the railroads. As a result of the enactment of the Transportation Act in 1920, consolidation of the railroads of the country, in the interest of economy and efficiency, became an established national policy, and the effective consolidation of the railroads in conformity to the provisions of the Act and to the plan of consolidation which the Commission was directed to prepare became a matter of public interest. The policy of consolidation is so intimately related to the maintenance of an adequate and efficient rail transportation system that the "public interest" in the one cannot be dissociated from that in the other. Hence, in considering whether the public interest under § 5 (4) (b) will be promoted by the conditions of an order authorizing a consolidation or lease, the Commission is free to consider their effect upon the national policy of consolidation as well as their more immediate effect on the adequacy and efficiency of the transportation system.

Obedient to the mandate of § 5 (2) of the Act the Commission has prepared and published a plan under which it is proposed that the railroads of the country be consolidated into a limited number of large systems. Consolidation of Railroads, 159 I. C. C. 522, 185 I. C. C. 403. By § 5 of the Act the ban on consolidation of railway carriers was removed, and acting under it the Commission has granted authority for numerous consolidations and leases in furtherance of the plan. In the preparation and execution of the plan it speedily became apparent that the great savings which would result from consolidation could not be effected without profoundly

affecting the private interests of those immediately concerned in the maintenance of the existing nationwide railway system, the railroad security holders and employees. The security holders are usually, though not always favorably affected by economies resulting from consolidation.[1] But the Commission has estimated in its report on unification of the railroads that 75% of the savings will be at the expense of railroad labor. Not only must unification result in wholesale dismissals and extensive transfers, involving expense to transferred employees, but in the loss of seniority rights which, by common practice of the railroads are restricted in their operation to those members of groups who are employed at specified points or divisions. It is thus apparent that the steps involved in carrying out the Congressional policy of railroad consolidation in such manner as to secure the desired economy and efficiency will unavoidably subject railroad labor relations to serious stress and its harsh consequences may so seriously affect employee morale as to require their mitigation both in the interest of the successful prosecution of the Congressional policy of consolidation and of the efficient operation of the industry itself,[2] both of which are of public concern within the meaning of the statute.

[1] In several cases the Commission has disapproved proposals for consolidations and for acquisition of control because of a failure to deal fairly with minority stockholders. Nickel Plate Unification, 105 I. C. C. 425; Unification of Southwestern Lines, 124 I. C. C. 401. In others it has approved the proposal on condition that these objections be removed. Buffalo, Rochester & Pittsburgh R. Co., 158 I. C. C. 779; Buffalo & Susquehanna R. Corp. Control, 162 I. C. C. 656; Upper Coos R. Control, 166 I. C. C. 76; Springfield Terminal Ry. Co. Control, 166 I. C. C. 90; Denver & Salt Lake R. Co. Control, 170 I. C. C. 4; St. Louis Southwestern Ry. Co. Control, 180 I. C. C. 175. See *United States* v. *Chicago, M., St. P. & P. R. Co.*, 282 U. S. 311, 337.

[2] On several occasions strikes of railroad employees affected by consolidations of plant facilities have threatened. To avoid interruption of transportation service an Emergency Board was invoked in 1929

One must disregard the entire history of railroad labor relations in the United States to be able to say that the just and reasonable treatment of railroad employees in mitigation of the hardship imposed on them in carrying out the national policy of railway consolidation, has no bearing on the successful prosecution of that policy and no relationship to the maintenance of an adequate and efficient transportation system. As was pointed out by Commissioner Eastman in his concurring opinion in this case the protection afforded to employees by the challenged conditions is substantially that provided in event of consolidation by an agreement entered into in May, 1936, between 219, the great majority, of the railroad lines of the country, and 21 labor organizations.[3] He also directed attention to the fact that the Committee of Six, three of whom were railroad executives, in their report to the President of December 23, 1938, recommended that the federal agency passing upon railroad consolidation "require as a prerequisite to approval a fair and equitable arrangement to protect the interests of . . . employees,"[4] and that this report had been ap-

under the Railway Labor Act of 1926 to arbitrate the dispute between the railroad and the employees of the Texas & Pacific Railway Company. The Board awarded the employees compensation for loss from depreciation of the value of their homes (cf. Clause 4 in the order here involved). The Board, after extensive hearings, found that such a requirement was reasonable in view of the fact that railroads themselves had on several prior occasions compensated the employees affected. 28 Monthly Labor Review, 1191 (1929). See also 43 Monthly Labor Review, 867 (1936) where dismissal compensation was agreed upon in similar circumstances under threat of a strike.

[3] The Chicago, Rock Island & Pacific System, represented here by appellee, was a party to this agreement. 42 Monthly Labor Review 1503 (1936); 57 Traffic World 995 (1936).

[4] Report of Committee appointed September 20, 1938, by the President of the United States, to submit recommendations upon the general transportation situation (December 23, 1938).

proved by the directors of the Association of American Railroads.

We can hardly suppose that the railroads, in entering into this agreement and endorsing this recommendation left out of account their own interest in the maintenance of transportation service or that their interest in this respect differs or is separable from that of the public interest. In fact, before this action by the railroads the Commission itself had taken the view that the welfare of dismissed employees must be considered in passing upon proposed consolidations,[5] and in its sixth annual report in 1892 it declared in recognition of the same principle, that "relations existing between railway corporations and their employees are always of public interest."[6] The Federal Coordinator of Railroads, in his fourth annual report to Congress in 1936, recommended the enactment of a comprehensive system of dismissal compensation, stating that such a system "would enhance the safety or efficiency of railroad service." H. Doc. No. 394, 74th Cong., 2nd Sess., p. 56.[7]

The now extensive history of legislation regulating the relations of railroad employees and employers plainly evidences the awareness of Congress that just and reasonable treatment of railroad employees is not only an essential

[5] Consolidation of Railroads, 185 I. C. C. 403, 427; Unification of Lines in Southern New Jersey, 193 I. C. C. 183, 198; St. Paul Bridge & Terminal Ry. Co. Control, 199 I. C. C. 588. For later cases to the same effect, see Associated Railways Company Acquisition and Securities, 228 I. C. C. 277, 336; Louisiana & Arkansas Ry. Co., Merger, 230 I. C. C. 156; Louisiana & Arkansas Ry. Co., Control, 233 I. C. C. 37, 123.

[6] Sixth Annual Report of Interstate Commerce Commission (1892), p. 323.

[7] For a similar conclusion, see J. Douglas Brown, et al., Railway Labor Survey, Social Science Research Council, Division of Industry & Trade (1933), 1, 94; Robertson, The Stake of Railroad Labor in the Transportation Problem, 187 Ann. Am. Acad. 88 (1936).

aid to the maintenance of a service uninterrupted by labor disputes, but that it promotes efficiency, which suffers through loss of employee morale when the demands of justice are ignored. Title 3 of the Transportation Act of 1920,[8] which was enacted at the same time as the provisions reënacted in substance in § 5 (4) (b), set up a "Labor Board" to decide railroad labor disputes involving grievances, rules and working conditions, and declared in § 301 "it shall be the duty of all carriers and their officers, employees, and agents, to exert every reasonable effort and adopt every available means to avoid any interruption to the operation of any carrier growing out of any dispute between the carrier or employees or subordinate officials." Congress has passed successive measures for arbitration of railroad disputes between railroad employees and employers, all aimed at the prevention of interruptions of railroad service through such disputes, and culminating in the passage of the Railway Labor Act of 1926, 44 Stat. 577, and in its amendments in 1934, 48 Stat. 1185, 45 U S. C., §§ 151, 163; *Texas & New Orleans R. Co.* v. *Brotherhood of Railway & Steamship Clerks,* 281 U. S. 548; *Virginian Ry. Co.* v. *Federation,* 300 U. S. 515. By the Wagner Labor Relations Act of 1935, 49 Stat. 449,

---

[8] This Act resulted from the experiences of the Director-General in operating the railroads during the World War period. Sharfman, The Interstate Commerce Commission, Vol. I, p. 181. The Director-General recognized the necessity of maintaining a loyal and devoted personnel in the interest of uninterrupted service. Thirty-third Annual Report of the Interstate Commerce Commission (1919), p. 4. In agreements executed by the Director-General with several railroad unions, provision was made for protection of seniority rights and for free transportation for the employee, his family and household goods (cf. Clause 3 of order here involved), when consolidations of facilities were ordered by the Director-General. See Agreement between the Director-General of Railroads and the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees (1920), Rule 77.

29 U. S. C., 151, it recognized and sought to prevent the interference with interstate commerce which may ensue from labor disputes arising in industry not engaged in transportation. See *National Labor Relations Board v. Jones & Laughlin. Steel Corp.,* 301 U. S. 1, 42; *National Labor Relations Board v. Fainblatt,* 306 U. S. 601, 604.

The Safety Appliance Act of 1893, 27 Stat. 531; see *Southern Railway Co. v. United States,* 222 U. S. 20; the Hours of Service Act of 1907, 34 Stat. 1415; see *Baltimore & Ohio R. Co. v. Interstate Commerce Comm'n,* 221 U. S. 612, and the Federal Employers Liability Act of 1908, 35 Stat. 65; see *Second Employers' Liability Cases,* 223 U. S. 1, 51, were designed mainly to insure the safety and welfare of railroad employees and the constitutionality of those measures was sustained in part on the ground that they fostered the commerce in which the employees were engaged. In passing the Adamson Act of 1916, 39 Stat. 721, fixing the wages of railroad employees, Congress thought that it was safeguarding the railroads of the country from interruption which might result from labor disputes and the constitutionality of the Act was sustained on that ground. *Wilson v. New,* 243 U. S. 332, 351. And in the Act of 1934, as amended in 1937, 48 Stat. 1283; 50 Stat. 307, 45 U. S. C., §§ 201, 214, 228 (a) to (r), providing for a retirement and pension plan for railroad employees, Congress declared in terms that the plan was adopted for the purpose of "promoting efficiency and safety in interstate transportation."

In the last regular session of Congress, an act to amend the Interstate Commerce Act was passed by the Senate, S. 2009, 76th Cong., 1st Sess. The House passed a substitute bill embodying extensive changes. H. Rept. 1217, 76th Cong., 1st Sess. Both bills are now in conference. But both as passed contain a provision carrying into effect the recommendation of the Committee of Six, see

S. Rept. 433, 76th Cong., 1st Sess., p. 29, by directing the Commission to require "as a prerequisite to its approval of any proposed transaction [consolidation or lease under § 5 (4) (b)] a fair and equitable arrangement to protect the interest of the employees affected." Both bills as enacted declare it "to be the national transportation policy of the Congress . . . to encourage fair wages and equitable working conditions, all to the end of developing, coordinating and preserving a national transportation system . . . by . . . rail . . . adequate to meet the needs of the commerce of the United States . . ." Congress has thus declared that fair and equitable provision for the compensation of losses thrown upon employees as the result of an authorized consolidation or lease promotes the national transportation policy by developing, coördinating and preserving the railroad transportation system.

In the light of this record of practical experience and Congressional legislation, we cannot say that the just and reasonable conditions imposed on appellees in this case will not promote the public interest in its statutory meaning by facilitating the national policy of railroad consolidation; that it will not tend to prevent interruption of interstate commerce through labor disputes growing out of labor grievances, or that it will not promote that efficiency of service which common experience teaches is advanced by the just and reasonable treatment of those who serve. In the light of that record too we do not doubt that Congress, by its choice of the broad language of § 5 (4) (b) intended at least to permit the Commission, in authorizing railroad consolidations and leases, to impose upon carriers conditions related, as these are, to the public policy of the Transportation Act to facilitate railroad consolidation, and to promote the adequacy and efficiency of the railroad transportation system.

The fact that a bill has recently been introduced in Congress and approved by both its houses, requiring as a matter of national railway transportation policy the protection of employees such as the Commission has given here, does not militate against this conclusion. Doubts which the Commission at one time entertained but later resolved in favor of its authority to impose the conditions, were followed by the recommendation of the Committee of Six that fair and equitable arrangements for the protection of employees be "required." It was this recommendation which was embodied in the new legislation. Sen. Rep. No. 433, 76th Cong., 1st Sess., p. 29. We think the only effect of this action was to give legislative emphasis to a policy and a practice already recognized by § 5 (4) (b) by making the practice mandatory instead of discretionary, as it had been under the earlier act.

It is said that the statute, as we have construed it, is unconstitutional because not within the Congressional power to regulate interstate commerce and is a denial of due process. It is true that in *Railroad Retirement Board* v. *Alton R. Co.*, 295 U. S. 330, in declaring the Railroad Retirement Act of June 27, 1934, 48 Stat. 1283, not to be a valid regulation of interstate commerce, it was said, among other reasons advanced to support that conclusion, that a compulsory retirement system for railroad employees can have no relation to the promotion of efficiency, economy or safety of railroad operation. But notwithstanding what was said there and even if we were doubtful whether the particular provisions made here for the protection of employees could have the effect which we have indicated upon railroad consolidation and upon the adequacy and efficiency of the railroad transportation system, we could not say that the Congressional judgment that those conditions have a relation to

the public interest as defined by the statute is without rational basis. Cf. *South Carolina Highway Dept.* v. *Barnwell Bros.*, 303 U. S. 177, 189, 191; *United States* v. *Carolene Products* Co., 304 U. S. 144, 147; *Pitman* v. *Home Owners' Loan Corp., ante,* p. 21.

If we are right in our conclusion that the statute is a permissible regulation of interstate commerce, the exercise of that power to foster, protect and control the commerce with proper regard for the welfare of those who are immediately concerned in it, as well as the public at large, is undoubted. *Second Employers' Liability Cases, supra,* 47; *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, 478; *United States* v. *Carolene Products Co., supra,* 147; *Mulford* v. *Smith,* 307 U. S. 38. Nor do we perceive any basis for saying that there is a denial of due process by a regulation otherwise permissible, which extends to the carrier a privilege relieving it of the costs of performance of its carrier duties, on condition that the savings be applied in part to compensate the loss to employees occasioned by the exercise of the privilege. That was decided in principle in *Dayton-Goose Creek Ry. Co.* v. *United States, supra.* There it was held that the Fifth Amendment does not forbid the compulsory application of income, attributable to a privilege enjoyed by a railroad as a result of Commission action, to specified purposes "in the furtherance of the public interest in railroad transportation." § 422(10), Transportation Act, 41 Stat. 490. Moreover we cannot say that this limited and special application of the principle, fully recognized in our cases sustaining workmen's compensation acts, that a business may be required to carry the burden of employee wastage incident to its operation, infringes due process. *Second Employers' Liability Cases, supra; New York Central R. Co.* v. *White,* 243 U. S. 188; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Cudahy Packing Co.* v. *Parramore,* 263 U. S. 418.

*Reversed.*