Frank L. SWACKER, Jr., et al.

v.

SOUTHERN RAILWAY COMPANY et al.

RAILWAY LABOR EXECUTIVES'
ASSOCIATION et al.

v.

SOUTHERN RAILWAY COMPANY et al.

Civ. A. Nos. 922, 976.

United States District Court
W. D. Virginia,
Abingdon Division.

March 20, 1965.

See also D.C., 32 F.R.D. 234.

No. 922:

Shannon & Newman, Appalachia, Va., for plaintiffs.

Leslie M. Mullins, and Robert T. Winston, Jr., Norton, Va., for Southern & Interstate, in both cases.

No. 976:

William G. Mahoney, Washington, D. C., for plaintiffs.

James I. Hardy, Washington, D. C., for Southern.

Marvin E. Frankel, Proskauer, Rose, Goetz & Mendelsohn, New York City, Roman J. Gerber, Hamilton & Hamilton, Washington, D. C., for Southern and Interstate.

DALTON, Chief Judge.

On June 12, 1959, the Southern Railway Company filed proceedings under 49 U.S.C. § 5(2) with the Interstate Commerce Commission requesting authority to acquire all the outstanding capital stock of the Interstate Railroad Company. The report of the Hearing Examiner, dated October 6, 1960, recommended the sale of Interstate's stock to Southern and, pursuant to 49 U.S.C. § 5(2) (f), imposed certain conditions for the protection of the railway labor of the Interstate company. These are known as the "New Orleans Conditions" as they were first delineated in the New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (1952). On February 16, 1961, the I.C.C.

approved the Examiner's report, whereupon the Railway Labor Executives' Association (RLEA) filed a petition on behalf of certain employees of Interstate who had been "furloughed" from work (that is, not discharged but temporarily suspended and subject to recall) and who had not received benefits under the Commission's report. This petition for reconsideration and modification was dismissed by the I.C.C. and its original order was made effective as of June 6, 1961.

Fifty-two of these furloughed employees press their claims for compensation in this court, and the two actions originally brought have been here consolidated for decision.

By an order entered on January 17, 1963 these causes were referred to a Special Master for findings of fact and conclusions of law. The Master found that the transaction did not entitle those employees designated as "maintenance of ways and structures" employees (generally section laborers) to benefits, but that the protection of the New Orleans Conditions should be extended to twenty-five employees other than maintenance of ways and structures men (generally car laborers).

49 U.S.C. § 5(2) (f) provides:

"As a condition of its approval, under this paragraph (2), of any transaction involving a carrier or carriers by railroad subject to the provisions of the part, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provision of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

There is no question or contention by either party but that the Interstate Commerce Commission had the authority to issue the protective provisions set forth in its order approving the acquisition.

The Master notes that it is clear from the decisions of the Interstate Commerce Commission that the transaction in question must be the proximate cause of the injury to the complaining employee in order for that employee to be entitled to benefits under the act. Further, the Commission expressly states that the effect of subsequent internal technological improvements by either of the carriers, *even if* made possible by improved financial circumstances partly attributable to the unification of control, is too indirect and remote to be considered a result of the transaction. Report of Special Master 21–22. So in this case we must consider not only whether particular employees were affected by the acquisition of control of Interstate by Southern, but whether they were affected in such a manner as under the law entitles them to receive benefits pursuant to section 5(2) (f).

 Great deference must be accorded the findings of the Master since they turn in large measure on the credibility of witnesses who have presented long, involved, and often conflicting testimony. United States v. Twin City Power Co., 248 F.2d 108 (4th Cir. 1957). His conclusions of fact must therefore be accepted unless they are clearly erroneous. Fed.R.Civ.P. 53(e) (2); London v. Troitino Bros. Inc., 301 F.2d 116 (4th Cir. 1962) Esdale v. Edwards, 28 F.R.D. 390 (W.D.N.C. 1961).

The plaintiffs in this case represent two distinct classes of employees: maintenance of ways and structures employees and those other than maintenance of ways and structures. The claims of these two broad groups present substantially different questions of fact and so they will be treated separately in this opinion. At the outset, however, it should be noted that with regard to *all* of the employees furloughed, the Master found:

(a) that furloughing is nothing new to the employees of Interstate, the device apparently having been utilized several times in the past;

(b) that all but two of the employees were furloughed *prior* to February 16, 1961, the date of the first order of the I.C.C. approving the report of the Examiner;

(c) that each was furloughed by Interstate and not by Southern;

(d) that Interstate did not act on the advice or direction of Southern in furloughing the employees; and

(e) that the action of Interstate was not in anticipation of the stock acquisition by Southern.

In addition, the Master noted that by virtue of the transaction Interstate has become a wholly owned subsidiary of Southern, and that the two railroads still retain their separate corporate identities. In other words, there has been no merger.

I. *Employees other than Maintenance of Ways and Structures.*

Prior to the acquisition it seems that Interstate obtained the cars with which it supplied its shippers of coal primarily from two sources: (1) some cars, all with a capacity of fifty tons, were built by Interstate in its shops at Andover, Virginia, and owned outright by it; while (2) a number of cars were rented from other railroads, primarily the Southern, on a per diem basis.

The evidence shows that in addition to generally being in a poor state of repair, the fifty ton cars owned by Interstate were also obsolete, as the trend in modern railroading is toward larger cars, primarily of the seventy ton and one hundred ton variety. In addition, the fifty ton car lacks the strength and construction to withstand the long modern trains now in use. For this reason, Interstate began discontinuing heavy repairs and retiring these old worn out cars as they became unserviceable. With heavy repairs stopped and the cars of other railroads available for use, there was no need for as many car repairmen, and certain employees (other than maintenance of ways and structures) were furloughed. The Master found from the evidence that Southern would have continued to furnish the cars needed by Interstate even if acquisition had not been allowed, and so denial of the petition would have produced no definite change in the policy of Interstate along these lines which would have resulted in more employment for these men. He further concluded that after the acquisition, Interstate continued to pay the per diem rental on the Southern cars which it used.

From the date of the acquisition, June 6, 1961, to June 1964, Interstate, for various reasons, retired 1094 cars and had some or all of them scrapped by two independent companies. Useable parts were salvaged and stored by Southern. With its fleet fast becoming unserviceable, Interstate was faced with the problem of acquiring more cars, which it could do in one (or all) of three ways: (1) by building some at its Andover shops; (2) by renting more cars from the Southern; (3) by buying the cars outright. Interstate decided to fulfill part of this need by purchasing 336 cars of the fifty ton capacity from David J. Joseph Company of Mountain Brook, Alabama, a dealer in second-hand railroad equipment. Although the purchase was handled by Southern's purchasing department (all matters of this type had been turned over to Southern), the cars were billed to and paid for by Interstate. Counsel for the plaintiffs seems to contend that Interstate was obligated to *build* all the cars it required, under penalty of Southern becoming liable to the furloughed employees for benefits. His theory is that since the employees would

be recalled for work if a building program were reinstated at the Andover shops the decision to buy rather than build diverted work from the Interstate employees. This was a result of the stock acquisition, he says, because Interstate is now a wholly owned subsidiary and hence it was actually Southern directing the moves. However the Master found, and correctly so, that the decision of whether to buy, build, or rent was one of policy for management and not the Court, and that there is nothing inconsistent in saying that the same decision could have been made without the acquisition in the normal course of Interstate's business.

After purchase, the cars were sent to Frieze Enterprises of Charlotte, North Carolina, for the purpose of having that company rebuild the cars to useable type and increase their capacity.

It further appears that after the acquisition Southern did some work on Interstate cars at its Koster shops in Knoxville, Tennessee. At first the evidence indicated that there were 125 of these cars which had been sidetracked because of Interstate's decision (prior to the acquisition) to discontinue heavy repairs. It was said that the work done at Knoxville was in the nature of an experiment to see if this decision by Interstate was justified. It now appears that 467 cars, or about twenty-three percent of the total Interstate fleet in service, were diverted to the Knoxville shops and light repair was done on them. 392 are still in service, 5 have been set out and require heavy repairs, and 70 have been retired and scrapped. Although the Master still found that these cars had been sidetracked, plaintiffs contend and defendant admits that they were still in service and cut out of Interstate trains by Southern. The state of repair of these cars before being pulled in by Southern is not entirely clear from the evidence.

The Master found that certain work which would have been done by Interstate employees but for the acquisition of control by Southern was diverted from Interstate, and allowed benefits to twenty-five employees. Specifically he found:

(a) that the work done on the 467 Interstate cars in Knoxville should have been done at Interstate's shops in Andover;

(b) that the work necessary to rebuild and enlarge the 336 cars purchased from the Joseph company should have been done at Interstate's shops in Andover;

(c) that the work done in cutting down and scrapping the unserviceable Interstate cars, done by independent contractors, should have been done at Interstate's shops in Andover.

These bases for recovery will be considered separately.

(a) *Repair of the 467 cars at the Koster shops.*

■ I think the Master was correct (except as to the extent of the recovery, which will be discussed later) in allowing benefits to the twenty-five employees as a result of the repair work done by Southern. This was clearly work physically diverted by Southern and was the proximate result of the stock acquisition.

■ From the evidence it would appear that car repair done by railroads is generally divided into three classes: (1) heavy repair; (2) light repair; and (3) running repair. Running repairs are relatively minor jobs which can be done quickly and without taking the car out of service. As a matter of courtesy, one railroad will do running repairs on cars which it is using but which belong to another company. Light repair seems to be somewhat of a misnomer as it can be a big job, short of a major overhaul, which requires taking the car out of service, at least for a time. Light repairs are *not* done on cars owned by other railroads. The heavy repair entails a major overhaul.

■ It seems manifest that the repair work in question should have been done at Interstate's shops in Andover. These were not cars which had been sidetracked and sent to Southern by Interstate, but were rather still in service when cut out of the trains by *Southern* and directed to the Koster shops. Defendant admits that light repair was done on these cars, and

by general railroading practice, light repair is never done on the cars of another railroad, certainly not as a gratuity and not on 467 cars.

Defendant argues that even if the work had been done at Interstate's shops it would have been done by the regular crew retained and not by the plaintiffs in this case, quoting the testimony of Mr. H. L. Stuart, Assistant to the President of Interstate, for support. On the other hand Mr. Willingham, the master mechanic for Interstate, testified that he had only a skeleton crew sufficient to handle *running* repairs at the Andover shops. (See Record before the Commission, p. 297). The Master found, and I cannot say that he was clearly erroneous, that twenty-five of these plaintiffs. would have been called back to do the light repair work on the 467 Interstate cars.

█ Southern claims that the work done was merely an experiment to ascertain if Interstate's decision to discontinue heavy repairs on these cars was justified. The conclusion, according to defendant, was that the decision was justified. It is not clear from the evidence that these cars had been set out and marked for heavy repair by Interstate. The fact that they were still in service at the time, and further that 392 are *still* in service after *light* repair would seem to refute this. In addition, the Master correctly held that 467 cars had passed the stage of an "experiment."

The Master allowed the affected employees the benefit of four years' salary (with certain modifications), the maximum obtainable under section 5(2) (f). In so doing, I think he erred.

The wording of the statute is somewhat ambiguous and if considered in a vacuum lends some credence to Southern's contention that the four year period describes the time during which the employees must have been affected, and not the period for which they are to receive benefits. However, looking at the Congressional Record and cases which have construed the section it is apparent that the four year provision designates the period during which, under normal circumstances, the employees are to receive pay. The remarks of conference chairman Lea in 86 Cong.Rec. 10178 are instructive on this point. He said: "It [the four year rule] means from the effective date of the order of the Commission the benefits are available for four years. The order determines the date, and the protective benefits run four years from that date." See also Railway Labor Executives Ass'n v. United States, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950) and United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939).

It is clear that the employees are entitled to some benefits. However, in assessing the extent of these benefits, I think a definite distinction should be drawn between employees *discharged* and those merely *furloughed,* the former usually being entitled to the full four years' benefits and the latter being entitled to pay only for work actually lost. Although court cases and decisions of the Interstate Commerce Commission are sometimes less than lucid on this point, most of them dealing with employees who have been completely discharged, such a distinction would seem to permit a fair application of section 5(2) (f) consonant with legislative intent.

█ In United States v. Lowden, supra, the case holding that the I.C.C. could constitutionally prescribe protective conditions in railroad acquisitions and mergers, the Supreme Court paraphrased the effect of the order of the Commission thusly:

"It [the Commission] accordingly authorized the lease upon the conditions which it has found to be just and reasonable: that for a period not exceeding five years each retained employee should be compensated for any reduction in [his] salary so long as he is unable, in the exercise of his seniority rights under existing rules and practices to obtain a position with compensation equal to his compensation at the date of the lease; that dismissed employees unable to obtain equivalent employment

be paid partial compensation for the loss of their employment in specified amounts * * *." 308 U.S. at 228, 60 S.Ct. at 250. So the four year provision seems to have been meant to partially compensate employees who were discharged by paying them the equivalent of four years' salary ("partial compensation" in the sense that it is assumed that the employee would have remained with the railroad for an indefinite period, longer than four years, drawing full salary). Retained employees were to be compensated for any reduction in salary. Retained employees includes those on furlough.

█ It must be remembered that these employees were furloughed before the acquisition and not in anticipation of it. Thus, the furlough was not colorable in any sense; Interstate was wholly within its rights in utilizing this common practice which it had employed several times in the past. Assuming no acquisition had taken place, these employees would have been paid only when recalled by Interstate for work. I think, therefore, that they are entitled to protective benefits only when they *should have been* recalled by Interstate and were not because of the acquisition of control by Southern. Any other arrangement would result in these employees receiving benefits during periods for which they would not have been paid had there been no acquisition, and being paid double for periods during which they may be recalled for work in the future (i. e., the regular salary plus the protective benefits). The purpose of the act was not to give the employees affected by the transaction a windfall and put them in a *better* position, but rather to insure that they will not be put in a worse position—that is, that they will maintain the status quo. The Interstate employees are to be paid for the work on the 467 Interstate cars which was done by Southern employees, and Southern is directed to forthwith furnish adequate up-to-date information by which the amount of work can be ascertained.

The Master seemed to think that unless the plaintiffs were given benefits for the full four years they would have to wait until the end of the four years to recover anything, as only then could they compute exactly how much work had been diverted. The result reached here will not require them to do this, but it does entail the complex procedure of this court retaining jurisdiction to award further benefits if it appears that more work is diverted from Interstate employees in the future. However the court will assume that both sides will continue to act in good faith—the plaintiffs will bring no frivolous claims and defendant will be open and above board in not depriving plaintiffs of any work to which they are entitled.

█ Defendant specifically assigns error to the granting of benefits to four employees: Rufus C. Seale, D. C. McCormack, W. M. Huneycutt, and Paul H. Body. As to the first three, it is claimed that because of the nature of their jobs these men would not have worked on the cars even if they had been repaired at Andover. The Master, however, after careful consideration of the work necessary to repair the cars, found that they would have and the Court cannot say that this is clearly wrong. The evidence shows that Body himself requested a furlough to enable him to investigate another job, as shown in the Record before the Master, p. 405 and p. 498, and defendant contends that Body is therefore entitled to no consideration. However, it is not the furlough which is in question as to any of these employees, but rather the failure to give them a chance to return to work. If Body had been given this opportunity and declined, he would be entitled to no benefits. The evidence disclosed that he currently has another job in Florida. This fact will go to the amount of benefits to which he is entitled, but not to his right to any benefits at all. The record shows that he is still on furlough and technically remains an employee of Interstate. (Record before the Master, p. 498.)

■ Plaintiffs make a claim for interest on the delayed payment of benefits. The Master found no provision in the law allowing interest in this case and Counsel has directed this court to none. The Master's disallowance of interest will stand.

(b) *Work done in rebuilding and increasing the capacity of the 336 cars purchased from David J. Joseph Company.*

■ In giving the employees benefits for the work done by Frieze Enterprises I think the Master erred. Assuming that Southern was responsible for the decision to have the cars rebuilt and enlarged by Frieze, it might be well to ask, *"Why was the work given to Frieze rather than Interstate?"* In the case of the cars repaired in Knoxville we have a pretty clear example of the evil which section 5(2) (f) was designed to combat—work which should have been done by Interstate employees was instead performed by *Southern* employees. It is easy to see that the acquisition of control was the proximate cause of this diversion. However, it is not as simple to trace the effect of the acquisition where the work in question is done by a contractor independent of both railroads. Assuming that Interstate could have done the work, there seem to be only two reasons why it would be given to Frieze: (1) Frieze could do it better at comparable cost; or (2) Frieze could do the same work at less cost. In either case the same decision could (and probably should) have been made by Interstate even if there had been no acquisition. As the decision of whether to buy or build cars was one for management and not the Court, so was the decision as to whether to rebuild at Andover or farm the work out.

As defendant points out, what was done was no different in principle from purchasing the cars built to specification from the Joseph Company. The Master seems to indicate that there would have been no diverting of work within the standards set out by the Interstate Commerce Commission if the work had been done by the David Joseph Company. In his Report on Reconsideration, he says on page 13: "This is extra work on the cars performed by a firm other than David J. Joseph Company of Mountain Brook, Alabama, from whom the cars were purchased." In all deference to the Master this distinction (if in fact it is being made) seems to be somewhat artificial and without basis in logic. In both cases, additional work will be done on the cars purchased, and in neither case will Interstate employees do the work. Plaintiffs have failed to carry the burden of showing that this was work diverted from Interstate as a result of the transaction.

(c) *The 1094 cars scrapped by independent contractors.*

■ What has been said with reference to the cars rebuilt and enlarged by Frieze Enterprises applies with equal force here, as the two situations are completely analagous. Again, whether to scrap the cars itself or employ an independent contractor was a policy decision for Interstate's management. Southern would have no reason to "divert" work from Interstate just for the sake of diverting it; it must be assumed that the decision to have the cars scrapped elsewhere was grounded on some valid economic basis. It was therefore a decision which Interstate could certainly have made without the acquisition.

There is evidence that salvaged parts from these scrapped cars are being stored by Southern. However, none of the plaintiffs in this action is employed in the stores department of Interstate.

■ Counsel for the plaintiffs puts forward various other diverse claims, in addition to those already considered, for benefits to be allowed all the plaintiffs (other than maintenance or ways and structures) in this case. The chief contention seems to boil down to this: the men are affected whether or not work is removed by reason of Interstate's acquisition of newer and larger cars from Southern, allegedly without paying any per diem. Along these same lines, counsel contends that the interchange between Southern and Interstate has been eliminated and

all the cars are now treated as belonging to one railroad—i. e., the Southern. [The employees are affected, according to counsel, because there are now less cars in use (and thus less to repair) by virtue of the larger capacities of those employed and in addition the cars are newer and require less repair] The Master found no merit in these claims and this Court agrees.

As has been pointed out, Interstate was renting cars from Southern before the transaction, but there is some evidence that this use increased after the stock acquisition. This might be partially explained (although there is no evidence on the point) if Interstate now rents exclusively from Southern and no other company. Even though this might be a result of the transaction, it would not be such as would give rise to any benefits to Interstate employees. It has been admitted that Interstate had to acquire more modern cars. Some of these it chose to acquire by purchase from the David J. Joseph Company, a decision which the Master correctly found to be for management. If it chose to acquire some by increased rentals from Southern, this was likewise a decision for management which had great likelihood for occurrence without the acquisition. The employees were affected to be sure, but not as a direct result of the transaction.

The Master found that Interstate and Southern retained their separate corporate identities and that Interstate continued to pay the per diem to Southern. He further noted that "the fact that the interchange is not physically made at the time of arrival of the cars is insignificant to the issue, since the dates for calculating wheelage is recorded." (Master's Report on Reconsideration, p. 14.) He was clearly correct in these findings that the cars were not pooled.

Plaintiffs devote much time to a discussion of the Washington Job Protection Agreement of May 21, 1936. This is a collective bargaining contract entered into by most of the railroads and Brotherhoods in the United States. In the New Orleans Union Passenger Terminal Case, supra, the I.C.C. prescribed, among other things, the protective benefits afforded by the Washington Agreement. To that extent, they are prescribed here, since the Commission applied the New Orleans Conditions to this case. However, for the Washington Agreement to be self-executing, the employees must be affected by a "co-ordination," which is defined as "joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities." (Section 2, Washington Agreement). For the record, the court affirms the Master's finding that there was no co-ordination within the meaning of the Washington Agreement. The Master expressed this position very well when he said:

"By no stretch of the imagination can it be said that Interstate lost its identity as a separate corporate entity. It is yet a separate corporation operating under its own name, and as such subject to all the rules and regulations of the I.C.C. applicable to railroads. The change is in the ownership of its capital stock which is now owned by Southern. There has been no unification, consolidation or merger. Those terms by their own definition mean a loss of identity, as by the issuance of stock of the controlling corporation to replace that of the corporation being absorbed." (Master's Report on Reconsideration, pp. 9–10.)

In light of the strict attitude taken toward mergers and acquisitions since the passage of the revised section 7 of the Clayton Act in 1950, the fact that one railroad is able to acquire all the capital stock of another shows that the situation in that industry is regarded as extraordinary and has been singled out for special treatment. Great competition from other modes of transportation have led to a steady decrease in the business of railroads, especially in the area of

passenger service, and has prompted some to designate it a "failing industry." The whole purpose of permitting an acquisition such as the one in the instant case is to give a small railroad a chance to survive by permitting it to take advantage of economies of operation which can be achieved as a wholly owned subsidiary of a large company.

The Interstate Commerce Commission, as well as the railroads themselves, realized the necessity for protection of the employees of the acquired company. At the same time, however, the protective conditions imposed are not meant as penalties which would neutralize any economies thus realized. The Master deals very well with this problem on page 7 of his Report on Reconsideration:

> "While not explicitly so stated, it seems to be a contention of the Plaintiffs throughout that no employee actively employed on the date of filing of the application by Southern with the I.C.C. could be deprived of employment or placed in a worse position because of the transaction, or because of any program of economies resulting from the transaction.

> "The I.C.C. at page 15 of its report dated November 7, 1962, rejected the 'attrition' rule condition and clarified what it had in mind by saying:

>> " ' * * * conditions calculated to preserve unneeded jobs would unduly restrict the applicants in the establishment of most economical operations, would be with the objectives of the national transportation policy under which we are enjoined to promote economical and efficient service and to foster sound economic conditions in transportation and among the several carriers.' "

II. *Maintenance of Ways and Structures Employees.*

██ Turning now to those employees designated as "maintenance of ways and structures" we find that none were allowed benefits by the Master. His reasoning was that their jobs were diminished as a result of subsequent internal technological improvements, noting that the I.C.C. has expressly stated its intention not to allow benefits to employees merely affected by such improvements. Plaintiffs admit the law on this point, but contend that the displacement of these employees was not due to internal technological improvements but rather to a consolidation of equipment. As already noted, the Master found that there was no consolidation of equipment, and his findings as to maintenance of ways and structures employees, not being clearly erroneous, will be affirmed.

All of these employees but two (who were furloughed in June, 1961) were furloughed prior to the acquisition of Interstate by Southern. There is little evidence to indicate that the reason for this furlough was other than the seasonal cut-offs which have also occurred in past years. There is some evidence that these men were furloughed because of the introduction of machinery and equipment used in the maintenance of tracks, but the record shows that there was very little equipment owned by Interstate prior to the acquisition. The Master found that these employees would have been called back for work except for the fact that after the acquisition Interstate began to *rent* some modern track and maintenance equipment which has replaced these employees.

██ No work has been removed from Interstate lines, but rather the same amount of work is being done with these machines and fewer men. It seems clear that the utilization of machines was a case of internal technological improvement. There is no way to move any work on the track over to the Southern, and the improvements could have been made by Interstate whether or not Southern had purchased it.

Plaintiffs admit that loss of jobs through scientific advancement is inevitable, but contend that this situation is not what the I.C.C. meant by subsequent internal technological improve-

ments. Counsel seems to contend that since the machines were owned by Southern before the acquisition, the improvement was therefore not "subsequent" and he quotes from an order issued by the Interstate Commerce Commission in the Southern Railway Control—Central of Georgia Case, Finance Docket 21400, to substantiate this position:

"In authorizing the transaction, we are not unmindful of the fact, stressed by the Association on exceptions, that future technological improvements, made possible by increased earnings as a result of the economies which would be effected by the transaction, may result in further displacement of employees."

In the same case, the Commission further stated:

"However, the 'effect' of subsequent internal technological improvements by either of the carriers, even if made possible by improved financial circumstances partly attributable to the unification of control, is too indirect and remote to be considered a result of the transaction; and it is not our intention that employees affected by such internal improvements shall be entitled to the benefit of the conditions."

In the Central of Georgia case, the improvements were made possible by improved financial conditions on the part of the Central Railway, and plaintiffs seem to argue that internal technological improvements are limited to that situation; in other words, to be applicable in this case, the situation would have to be one where Interstate was placed in a better economic position as a result of the transaction, and thus was *subsequently* able to buy or rent new machinery.

This position is untenable. It seems clear that the purpose of the clause ("*even if* made possible by improved financial circumstances partly attributable to the unification of control * * ") was to apply a general rule to the specific case at hand, and not to limit the concept of internal technological improvement to the facts of the Central of Georgia case. The fact that Southern had modern equipment available for rental does not change the basic nature of the improvement. In fact, there is merit in the contention that this situation fits the facts of the Central of Georgia case since Interstate did not begin extensive equipment rental until after the acquisition.

As the work continued to be performed exclusively by Interstate employees, it was internal to the Interstate line. As the I.C.C. has pointed out, one of the purposes of mergers and acquisitions is to promote economy partially through the reduction of personnel. See Master's Report on Reconsideration, p. 4.

It appears that the main factor which influenced the Master's findings with relation to these employees was the decision of the three judge court for the Eastern District of Virginia in the case of Railway Labor Executives Ass'n v. United States, D.C., 226 F.Supp. 521, which affirmed the interpretation of the I.C.C. in the Central of Georgia case. Counsel for plaintiffs stresses the fact that in that case Southern was merely a shareholder in the Central, while here it is full owner of all the stock of the Interstate. Sole stock ownership, however, does not in this case alter the character of what is otherwise an internal technological improvement.

The Master's Report is affirmed in part and modified in part, in accordance with this opinion of the Court.

The result of this decision is to allow benefits to those plaintiffs (car employees) on furlough who were affected by the diversion of the 467 cars to the Koster shops of Southern for repairs.

Counsel are requested to promptly prepare and furnish to the Court a detailed up-to-date statement of the labor expended at the Southern shops on these cars, together with a list of the employees who would be entitled to this work had it not been transferred, and the respective amounts due each of them.

Defendant shall pay the costs of this proceeding, including the fee due the Special Master for the supplemental report.