**Carroll P. REED et al., Plaintiffs-Appellees,**

v.

**Robert W. MESERVE et al., Defendants, Robert W. Meserve, Trustee, etc., Defendant-Appellant.**

**No. 73–1147.**

United States Court of Appeals, First Circuit.

Argued Sept. 7, 1973.

Decided Nov. 15, 1973.

Sidney Weinberg, Boston, Mass., for appellants.

Frederic K. Upton, Concord, N. H., with whom Upton, Sanders & Upton, Concord, N. H., was on brief, for Carroll P. Reed and William Levy, appellees.

Charles H. White, Jr., Atty., I. C. C., with whom Fritz R. Kahn, Gen. Counsel, Washington, D. C., was on brief, for I. C. C., appellee.

Before COFFIN, Chief Judge, KILKENNY * Senior Circuit Judge, and CAMPBELL, Circuit Judge.

* Of the Ninth Circuit sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

Meserve, trustee of the bankrupt Boston & Maine Corporation (B & M), appeals from a district court order requiring him to sell 8.5 miles of rail trackage in New Hampshire to appellee, North Conway Depot Company (Depot). Depot, a partnership, has since 1965 owned the B & M's former depot, turntable, engine house, and sundry railroad properties in the Village of North Conway. It also owns a steam locomotive and passenger cars, and wishes to purchase the 8.5 miles of track in order to operate a passenger-carrying scenic or excursion railroad.

The disputed trackage is the northerly tip of the Conway Branch on which, until recently, the B & M had provided freight rail service. In 1969 the B & M and, after bankruptcy, its § 77 trustees, petitioned the ICC for a certificate of public convenience and necessity allowing [1] it to abandon the 31 mile Branch. In the summer of 1972, following proceedings before both an Administrative Law Judge and Division 3 of the ICC, the ICC issued a certificate allowing the railroad to abandon the northernmost 19 miles. Permission was "conditioned upon resale . . . to any responsible person for the purpose of continued operation within 60 days from the date of issuance of a certificate." The trustee took no exception to any part of the final order and has since discontinued all service on the part of the line where abandonment was allowed.

Depot, claiming to be a responsible person desirous of acquiring the 8.5 mile segment for continued operation, sought to negotiate with the trustee during the prescribed 60 day period. The trustee, however, refused to recognize Depot as a prospective purchaser for continued operation and declined to afford it prior negotiating rights. Since no others purporting to be beneficiaries of the condition came forward within the 60 days, the trustee issued a public invitation for sealed bids.[2] The segment in question attracted a $90,000 offer from a bidder proposing to dismantle the tracks and resell the real estate. Depot then brought this suit, obtaining a temporary order restraining the sale.[3] At a hearing, the district court ruled that Depot "would be a 'responsible person' acquiring said line 'for the purpose of continued operation'." It was granted "preferential consideration for a period of sixty days" from the date of decision before the trustee could "proceed with the free transfer of title of the 8.5 mile segment." Reed v. Meserve, 353 F.Supp. 141, 148 (D.N.H.1973). Sale was enjoined to allow "good faith negotiations" between the trustee and Depot.

In the ensuing 60 days Depot offered to match the $90,000 bid. The outside bidder then made a counteroffer of $101,000, which the trustee communicated to Depot in a letter requesting a matching bid. Depot, believing that this procedure violated the spirit of the injunction, requested the court to extend the injunction and order the trustee to cease the "auction" process and bargain

1. "[N]o carrier by railroad . . . shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." 49 U.S.C. § 1(18).

2. The invitation was for the entire 19 miles authorized to be abandoned, or any part thereof. A date was set therein upon which the bids were to be publicly opened and read, but the trustee reserved the right to reject "any and all bids."

3. Suits to enforce ICC orders are authorized by 49 U.S.C. § 16(12), providing in part,
"If any carrier fails or neglects to obey any order of the commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission *or any party injured thereby*, or the United States . . . may apply to any district court of the United States of competent jurisdiction for the enforcement of such order." (Emphasis added.)
In an agreed statement of facts, the trustee and Depot admitted to the jurisdiction of the district court under 28 U.S.C. § 1336(a).

exclusively with Depot and any others entitled to priority. The court, after a hearing, ordered negotiations to proceed and extended the injunction for 30 days. The ICC appeared for the first time at that hearing. Its answer, filed on the same date, conceded the court's jurisdiction and emphasized that the order in question had created prior rights in favor of "any" responsible persons for the purpose of continued operation—a reminder seemingly irrelevant, since no prospective purchaser other than Depot was claiming to be a beneficiary of the condition.

After another month of fruitless negotiations the court finally cut the Gordion knot. It found that $101,000 was the highest offer to date and that Depot had offered to meet it. It ruled that, because of Depot's preferential status, it was entitled to buy at that price. The trustee was ordered to sell to Depot.

The trustee has conceded that Depot is a "responsible person" within the meaning of the condition, but he denies that Depot would be acquiring for "continued operation." Depot's status under the condition is illuminated by the evolution of the final language.[4] The Administrative Law Judge, who first heard the abandonment petition, found that Depot and B & M were then "engaged in negotiations for the sale and purchase of a portion of the track and right of way at the northern end of the line for operation of an excursion railroad line which would be of economic benefit to the area." He proposed to exempt that segment from an order directing sale of the remaining tracks to the State of New Hampshire, within 60 days from the date of the abandonment certificate, at a price not less than "fair net salvage value." The Administrative Law Judge apparently believed that a sale to Depot would be more desirable than a sale to the State; because a sale to the State would be for "the public use including

the possible operation of a short-line railroad," one might infer that the Judge conceived of Depot's scheme not only as a kind of public use but as involving a type of continued operation of the line.

The Administrative Law Judge's proposed order was in large measure affirmed by Division 3, notwithstanding appeals from shippers and New Hampshire. The conditions were, however, reworded. The requirement of a sale within 60 days to New Hampshire was deleted. In its initial order of April, 1972, Division 3 noted that there was no indication that negotiations with Depot "have been finalized or . . . will . . . be successful; . . . other persons may be interested in purchasing the portion of rail line; . . . accordingly, the condition should be modified to provide for resale to any responsible person for the purpose of continued operation; . . ." The reworded provision was obviously meant to place all purchasers for continued operation on an equal footing. And while Division 3 plainly meant to open the preferred group to "other persons," there is nothing to suggest that it meant to close it either to Depot or the State, the only two parties which, all along, had expressed some interest in purchasing for a railroad-type usage.

Against this history we are not impressed with the trustee's argument that the proposed excursion passenger service would not amount to operation of a "railroad" nor constitute, technically, a continuation of the B & M's prior service, which had been devoted to hauling freight. Depot represents that it will afford regular service, that it will be regulated as a railroad by the New Hampshire Public Utilities Commission, and that it stands ready to contract for freight service with any short haul freight operator. There was ample sup-

4. The evolution of the wording of an administrative order, like the legislative history of a statute, is an appropriate aid in resolving ambiguity. The final order is, of course, controlling, cf. 5 U.S.C. § 557(b), but prior drafts and proposed orders may shed light on what the final order means.

port for the district court's conclusion that,

"the purpose of the condition was an attempt to keep the abandoned segment intact as a railroad line and to prevent its dismantlement. The plain meaning of the words 'continued operation' is to continue the operation of a railroad over the abandoned line. If the Commission intended the phrase 'continued operation' to mean a freight and passenger operation, these words could have been used . . . ." 353 F.Supp. at 148.

The ICC itself offers no contrary interpretation of its order.[5] Given that posture, and the absence of any appeal from the district court's judgment by the ICC, there is no reason for us to consider, as suggested at one point by ICC's counsel, remanding to the agency for clarification. The district court, for the reasons it set forth, properly decided that this was no longer a matter within the primary jurisdiction of the ICC. *Id.* at 144–145. Remand would only waste time and money.

The trustee also urges that the condition, if construed to include Depot, would exceed the jurisdiction of the ICC and should not, therefore, be so construed and enforced. The Interstate Commerce Act, 49 U.S.C. § 1(20), grants to the ICC the authority to "attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require." The trustee argues that ICC itself his limited its authority under this section to the imposition of conditions that advance some facet of interstate transportation. The cases do not, however, support such a narrow view.[6] The ICC has often imposed conditions re-

dounding to the benefit of the locality, particular shippers, or the railroad's employees, regardless of whether these conditions were a direct boon to interstate transportation. United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939); Colorado v. United States, 271 U.S. 153 (1926); Nebraska ex rel. Nebraska State Ry. Comm'n v. United States, 255 F.Supp. 718 (D.Neb.1966). The ICC itself, in Proposed Abandonment by Boston & Maine R. Co., 105 I.C.C. 13, 16 (1925), announced a policy of balancing and considering, along with the effects on transportation, the effect of an abandonment on the communities immediately affected. *Cf.* C. Cherington, The Regulation of Railroad Abandonments 125–36, 172–79 (1948). In the present instance, the ICC was entitled, as the Administrative Law Judge did, to take account of the local economic benefit of an excursion railroad, which might be expected to attract tourists.

The phrase "public convenience and necessity" is not, of course, infinitely elastic. The ICC may not ignore the effects of its decisions on interstate commerce or competition for traffic. The phrase "must be given a scope consistent with the broad purpose of the Transportation Act of 1920, 49 U.S.C.A. § 7 et seq.: to provide the public with an efficient and nationally integrated railroad system." ICC v. Railway Labor Executives Ass'n, 315 U.S. 373, 376, 62 S.Ct. 717, 720, 86 L.Ed. 904 (1942). But even a tiny scenic railroad might be thought to contribute much more to such objectives than uses that would require the tracks and right of way to be destroyed. To assemble a right of way in our increasingly populous nation is no longer simple. A scarcity of fuel and the adverse consequences of too many motor

---

5. In a brief relating to this appeal, the ICC states that it does not "object to the district court's legal conclusions." From this and from what counsel stated at the argument, it seems that the ICC does not question that Depot would be in the category of purchaser established by its order.

6. *See* cases cited in text, *infra.* Even the quotation in Washington & Old Dominion R.

Abandonment—Virginia, 331 I.C.C. 587, 589 (1968), so heavily relied upon by B & M, states only that the ICC will "consider" transportation needs. One recent case, Burlington Northern Abandonment, 342 I.C.C. 446 (1972), conditions grant of the certificate on devotion of the lands to public park use.

vehicles suggest that society may someday have need either for railroads or for the rights of way over which they have been built. A federal agency charged with designing part of our transportation policy does not overstep its authority when it prudently undertakes to minimize the destruction of available transportation corridors painstakingly created over several generations. The ICC has in other instances imposed right of way preservation conditions even though the right of way was to be used eventually for a highway rather than a railroad. Norfolk & Western Ry. Abandonment, 193 I.C.C. 363, 368–69 (1933); St. Louis —S.F. Ry. Abandonment, 158 I.C.C. 602, 613 (1930); Washington & Old Dominion R. Abandonment—Virginia, 311 I.C. C. 587 (1968).

█ We hold that the I.C.C. was well within its statutory authority to impose on B & M's abandonment a condition which would include entities like Depot among those given a preference to purchase.

Although the ICC neither appealed nor directly challenged the district court's interpretation of the order, it urges us, somewhat mystifyingly, to upset the district court's judgment. It reminds us that abandonment was merely permissive and urges that, therefore, a court cannot "order" abandonment by ordering the sale of a line. This point might carry weight were it not perfectly plain that the trustee and the B & M have already abandoned. Abandonment need not involve a sale. In re Boston Terminal Co., 71 F.Supp. 472, 473 (D. Mass.1947). "Discontinuance of operations by the trustee is abandonment of operations by a carrier within the meaning of § 1(18)." Smith v. Hoboken R. Co., 328 U.S. 123, 130, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). Counsel for the trustee conceded that all operations ceased at a time prior to the district court proceedings. The trustee's solicitation of bids for purchase of the property at about the same time merely underscored the obvious.

The literal remedy for breach of the condition might be thought to be an order requiring resumption of service. But we think the district court was entitled to treat the trustee as having, by his act of abandonment, undertaken to perform any valid precondition thereto. Negotiation with, and sale to, responsible persons for continued operation was such a precondition. The district court could, as it did, specifically enforce it.

█ The trustee does not appeal concerning the adequacy of the price of $101,000. There is no evidence that the price is inadequate. It is substantially more than the scrap value figure (which includes the fair market value of the real estate) established by the Administrative Law Judge under 49 C.F.R. § 1201 and left undisturbed by Division 3. The trustee did not appeal either that valuation or the condition itself; he may not collaterally attack either here, and has, indeed, not attempted to do so. 3 K. C. Davis, Administrative Law Treatise § 20.06 (1958; Supp.1970). It is true that the trustee's sole apparent reason for contesting Depot's right to purchase is his belief, or hope, that by holding on he may be able to get more money. But the condition is meaningless unless read to require the trustee to sell to a preferred purchaser at a reasonable price if one is offered. Here we need not decide whether such a price is (as the Administrative Law Judge's decision suggests) scrap value, or whether it is something more. The district court ordered sale at a higher price matching the highest public bid thus far received. There is nothing to suggest that the railroad will not be adequately and fairly recompensed, at a level at least in accordance with, and probably greater than, what the ICC order contemplated.

Affirmed.

Costs for appellee.