George KRAUS and Antonio Aleman,
Plaintiffs–Appellees,

v.

SANTA FE SOUTHERN PACIFIC COR-
PORATION, and The Atchison, Topeka
and Santa Fe Railway, Defendants–Ap-
pellants.

Nos. 87–4295, 87–4423.

United States Court of Appeals,
Ninth Circuit.

Argued Sept. 14, 1988.

Submitted Sept. 21, 1988.

Decided July 3, 1989.

Shirley M. Hufstedler, Los Angeles, Cal., for defendants-appellants.

Elden M. Rosenthal, Portland, Or., for plaintiffs-appellees.

Before SCHROEDER, PREGERSON and LEAVY, Circuit Judges.

SCHROEDER, Circuit Judge:

## INTRODUCTION

This is an appeal from a damage action that arose from the plaintiffs' employment termination by their employer, the Southern Pacific Transportation Company (Southern Pacific). The case arises in the historical context of a proposed merger, never consummated, between the Southern Pacific Railroad and the Atcheson, Topeka and Santa Fe Railway (Santa Fe). Plaintiffs won a substantial jury award of both compensatory and punitive damages on two independent theories, one under state law and the other under federal law.

The state law theory was asserted against both the Santa Fe Railway and the holding company formed in contemplation of the merger, Santa Fe Southern Pacific Corporation (SFSP). That claim was brought under Oregon state law of tortious interference with economic relationships. Plaintiffs' factual contention, which the

jury accepted, was that Santa Fe had induced the plaintiffs' employer to terminate plaintiffs in order to avoid possible post-merger liabilities which might have been imposed by the Interstate Commerce Commission (ICC).

Plaintiffs' other and more novel theory was a federal claim, asserted only against the Santa Fe Railway. That claim was that Santa Fe's conduct amounted to an unauthorized merger or acquisition of control by Santa Fe over Southern Pacific in violation of section 11343 of the Interstate Commerce Act (ICA), 49 U.S.C. §§ 10101–11917 (1982 & Supp. II 1984).

We hold that by virtue of the provisions of the ICA conferring exclusive jurisdiction over enforcement of its merger provisions upon the ICC, the district court lacked jurisdiction over the federal claim. However, subject matter jurisdiction over the state law claim was conferred by virtue of diversity of citizenship. We affirm the judgment and imposition of damages against the defendants and in favor of plaintiffs on the state law claim.

## FACTS

The two plaintiffs were employed by Southern Pacific, which operates a railroad in the western United States. Plaintiff George Kraus was the manager of Southern Pacific's Portland Public Relations Office, with thirty years of seniority. Plaintiff Antonio Aleman was Manager in Southern Pacific's Houston Public Relations Office, with twelve years of seniority. In June 1985, Southern Pacific initiated a voluntary force reduction program for its non-union employees which ostensibly was aimed at reducing Southern Pacific's financial losses. Although the plan was voluntary, Southern Pacific informed the plaintiffs that their respective offices would be closed at the conclusion of the plan and that their options were limited either to taking part in the plan or being later terminated without benefit of the plan. Kraus elected to participate in the plan under protest, and his employment terminated pursuant to the plan. Aleman rejected the plan and was later fired.

According to the plaintiffs, the reason for their terminations went back to 1980, when Southern Pacific began discussing with Santa Fe, another large railroad in the western United States, the possibility of merger to improve their mutual financial prospects. They formed a joint holding company, SFSP, to issue stock in the new corporation that would result from the merger. Final agreement was reached in October 1983, and the stockholders of both railroads voted to approve the proposed merger in December 1983.

ICC approval was necessary for merger of the two companies' railroad operations, although no approval was required to combine their non-rail operations. In December 1983 the ICC approved Southern Pacific's proposed use of a blind voting trust to insulate Southern Pacific's railroad from control by SFSP or Santa Fe until the ICC approved the merger, on condition that Santa Fe and SFSP refrain from attempting to control Southern Pacific's railroad. At this time, all non-rail operations were merged, placing all operations of both companies save for the Southern Pacific Railroad under the control of SFSP.

The evidence at trial showed that during the pendency of the ICC's merger proceedings, Santa Fe turned its attention to the costs of running the business after the merger, confident that the merger would be approved. Southern Pacific, although its voting stock was not yet controlled by SFSP and Santa Fe, apparently shared Santa Fe's desire to conclude the merger transition with as little expense as possible. During a July 1984 telephone conference between the main office and regional offices of the Southern Pacific Public Relations Department, the head of the department advised his staff that "the Santa Fe people believed in a leaner staff." During autumn of 1984, Kraus was told by the chief executive officer of Santa Fe Industries, Santa Fe's parent holding company, that the Southern Pacific Regional Public Relations Offices would probably be closed because the chief executive officer of Santa Fe "doesn't want to pay for it." Shortly after, a chart was circulated among the

Southern Pacific public relations staff that showed a proposed organizational plan for the combined public relations department after the merger was completed. The chart indicated that no regional public relations departments or managers would continue except in Los Angeles, and that most of the slots in the new combined public relations department would be filled by Santa Fe or SFSP personnel.

Plaintiffs at trial stressed the significance of a "personal and confidential" letter written by Denman McNear, Chief Executive Officer of Southern Pacific, to Larry Cena, Chief Executive Officer of Santa Fe. The letter contained a detailed proposal by McNear to close the regional public relations offices of Southern Pacific prior to completion of the merger. The letter set forth the names and exact severance packages to be offered to each of the regional public relations employees, including the plaintiffs.

In May 1985, an SFSP vice president in charge of employee benefits wrote a "personal and confidential" memo to John Schmitt, CEO of Santa Fe Industries, analyzing the advantages of the proposed Southern Pacific severance program. At trial, plaintiffs argued that the memo evidenced defendants' intent to avoid obligations toward the plaintiffs and others that the defendants feared would be imposed by the ICC. The memo stated:

> it is [Southern Pacific's] opinion that a severance program is necessary to provide them a way to give employees incentive to terminate. ... [Southern Pacific] also believes the implementation of a severance program now will avoid the higher expense of merger-related severance (New York Dock) later.
>
> After review of [Southern Pacific's] study, I am in agreement with its conclusion and recommend you approve the severance plan.

The "higher expense of ... New York Dock" refers to a type of protective employee benefits package required to be given to employees terminated because of railroad mergers. The ICC formulated this package in *New York Dock Ry.—Control*

*—Brooklyn E. Dist. Terminal,* 30 I.C.C. 60, *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). The package is commonly known as the "New York Dock conditions." Award of a benefits package at least as protective as the New York Dock conditions where appropriate is statutorily required in a railroad merger transaction. *See* 49 U.S.C. § 11347.

In June 1985, a few weeks before the severance program was adopted, a member of Santa Fe management prepared a memorandum for Santa Fe Chief Executive Officer Cena. The memo estimated the costs of terminating personnel such as plaintiffs following merger of the railroads. The memo estimated the costs of eliminating personnel by distinguishing between those employees possibly protected by the New York Dock conditions and those employees not so protected, assuming that an annual salary of $65,000 was the maximum amount placing an employee under the New York Dock conditions. Under this assumption, both plaintiffs would have been covered by the New York Dock conditions. The memo specifically spelled out, department by department, the New York Dock conditions costs for middle management reductions. One of the departments included in the memo was the Southern Pacific Public Relations Department. The memo concluded that reductions in personnel covered by the New York Dock conditions would cost the merged company over $40 million.

Shortly thereafter, in the summer of 1985 and before the ICC merger decision, Southern Pacific closed its regional public relations offices and offered the voluntary termination option to its employees. As a direct result, both plaintiffs eventually lost their jobs. The merger between Southern Pacific and Santa Fe was ultimately denied by the ICC in *Santa Fe S. Pac. Corp.—Control—Southern Pac. Transp. Co.,* 2 I.C.C.2d 709 (1986), and the Southern Pacific was eventually merged into the Denver and Rio Grande Western Railroad Co. *Rio Grande Indus., Inc., SPTC Holding, Inc. and the Denver and Rio Grande W. R.R.*

*—Control—Southern Pac. Transp. Co.,* Fin.Dkt. 32000, Sub–No. 1 (Sept. 12, 1988).

Following their termination, the plaintiffs brought this suit against SFSP and Santa Fe, advancing two theories of wrongful termination. Against the Santa Fe Railway, they claimed first that Santa Fe's pre-merger actions in encouraging and approving Southern Pacific's termination of its employees constituted unlawful "control" over the other merging party, violating the ICA prohibition against acquisition of control pending merger approval, 49 U.S.C. § 11343. The ICA cause of action could be asserted only against the Santa Fe Railway and not against SFSP because the jurisdictional statute upon which the plaintiffs relied applies only to a "common carrier providing transportation subject to the jurisdiction of the [ICC]." 49 U.S.C. § 11705(b)(2). Santa Fe was such a carrier and SFSP was not. In their second cause of action, asserted against both Santa Fe and SFSP, they stated a tort claim under Oregon law for intentional interference with economic relations. This claim was predicated on Santa Fe's alleged wrongful interference to bring about the terminations in order to evade expenses from New York Dock conditions awards that could arise if Santa Fe terminated the plaintiffs after the merger had been approved.

The jury was separately instructed on each cause of action, and also instructed that it was required to avoid a double recovery by awarding one set of damages against Santa Fe even if it found Santa Fe liable under both state and federal claims. The jury was provided with a verdict form that broke out the individual verdicts for each claim as it pertained to each plaintiff. The jury returned verdicts in favor of both Kraus and Aleman against Santa Fe on both claims and against SFSP on the tortious interference claim. The jury awarded Kraus and Aleman, respectively, $398,539 and $57,697 in economic damages, $300,000 and $100,000 in emotional distress damages, $600,000 each in punitive damages against SFSP, and $400,000 each in punitive damages against Santa Fe. The trial judge further awarded attorneys' fees and costs based on 49 U.S.C. § 11705(d)(3).

Although the defendants summarily asserted in the pretrial order that plaintiffs had failed to state a claim under federal law and that 49 U.S.C. § 11343 did not provide plaintiffs with a cause of action, these points were never further raised or argued prior to the verdict. Defendants argued for the first time in their motion for judgment notwithstanding the verdict that federal subject matter jurisdiction over the statutory claim was lacking, and that the ICA completely preempted the state law tort claim. The motion for judgment notwithstanding the verdict was denied, and defendants timely appeal.

## CLAIM OF VIOLATION OF THE INTERSTATE COMMERCE ACT

■ Plaintiffs' claim for damages arising out of violation of federal law is based upon a claimed violation of the federal statutory scheme governing mergers, consolidation, and acquisition of control of common carriers. Specifically, the plaintiffs maintain that defendants' conduct in securing their terminations violated 49 U.S.C. § 11343(a), which provides that a carrier or an entity that controls a carrier may not merge with or acquire control of another carrier without the approval and authorization of the ICC. Plaintiffs managed to persuade the jury that the defendants' conduct in influencing Southern Pacific to fire them amounted to an "acquisition of control" within the meaning of that statute.

Neither 49 U.S.C. 11343(a), however, nor any other provision of the subchapter governing combinations of carriers, provides for any remedy by way of a private civil damage action for violation of its provisions. In this appeal defendant Santa Fe Railway contends correctly that the district court lacked subject matter jurisdiction over this claim.

The jurisdictional provision upon which plaintiffs attempt to rely is contained in a separate statutory subchapter relating to enforcement of interstate commerce laws and regulations. The precise provision relied upon is 49 U.S.C. § 11705(b)(2), which

states that a carrier "is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of [the ICA]."[1] Plaintiffs maintain that under this section, a private civil action in district court may be maintained by any person who claims to have been injured by a premerger acquisition of control that the ICC has not authorized, because it violates section 11343(a). Plaintiffs thus contend that section 11705(b)(2) in effect authorizes district court judges and juries, as opposed to the ICC, to define in the first instance what constitutes unauthorized merger or acquisition of control of railroads.

The flaw in this argument is that the subchapter of the ICA relating to mergers specifically provides that "the authority of the Interstate Commerce Commission under this subchapter is exclusive." 49 U.S.C. § 11341. Under the statutory grant of authority over mergers, the ICC, and not the courts, has been given authority to define what constitutes an unauthorized merger or acquisition of control within the meaning of the statute. The ICC has been given wide administrative discretion to tailor remedies and sanctions for violation of the statute and its own orders. The leading case illustrating this principle is *Gilbertville Trucking Co. v. United States,* 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962), where Chief Justice Warren's opinion emphasized that in enacting the provisions proscribing unauthorized acquisition of control, Congress "left to the agency charged with enforcement the determination from the facts whether 'control' exists,

subject to normal standards of review." *Id.* at 125, 83 S.Ct. at 223.

It is certainly true that *Gilbertville Trucking* did not involve a private damage action and hence did not in express terms preclude private reliance on judicial remedies under section 11705. As to this particular point, this is a case of first impression. Yet history reflects the ICC's unchallenged occupancy of the field for decades, and offers no support for the plaintiffs' position. The case most analogous to this one appears to be *B.F. Goodrich Co. v. Northwest Indus., Inc.,* 424 F.2d 1349 (3d Cir.), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). There, the Third Circuit dismissed a district court action to enjoin acquisition, because "Congress clearly placed complete initial control of acquisitions involving federally regulated carriers in the Commission," and stated that "[w]e find nothing in the Act which would authorize a private party to bring an action in a district court to enforce [section 11343 as then codified]." *Id.* at 1355. *See also Neisloss v. Bush,* 293 F.2d 873, 878 (D.C. Cir.1961) (predecessor of section 11343 did not authorize original action in district court).

■ We agree with Santa Fe that the provision upon which plaintiffs rely, 49 U.S.C. § 11705(b)(2) & (c)(1), authorizes court enforcement for violations of the merger provisions only after the ICC has considered whether the alleged violations have occurred.[2] In the absence of any

---

1. Section 11705(b)(2) provides:

   A common carrier providing transportation subject to the jurisdiction of the Commission under [certain subchapters] of this title is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of the subtitle.

   Plaintiffs read this section in conjunction with section 11705(c)(1) which provides in pertinent part:

   A person may file a complaint with the Commission under section 11701(b) of this title or bring a civil action under subsection (b)(1) or (2) of this section to enforce liability against a common carrier providing transportation subject to the jurisdiction of the Commission under [certain subchapters] of this title....

2. Plaintiffs have called to our attention the divided opinion of the ICC in *Santa Fe S. Pac. Corp.—Control—Southern Pac. Transp. Co.,* Fin. Dkt. 30400, Sub–No. 21 (Feb. 9, 1989), which was filed after this appeal was briefed and argued. There, the majority expressed the view that Southern Pacific employees who believe they were harmed by actions taken in anticipation of the Southern Pacific–Santa Fe merger could find a remedy in district court under 49 U.S.C. § 11705. The statement appears to rest on the ICC's conclusion that court litigation of the particular facts in this case would not interfere with the ICC's previous exercise of jurisdiction over the merger. The ICC decision does not, however, consider the larger jurisdictional implications, or cite or discuss the relevant Supreme Court cases or any other authority on point.

such ICC consideration here, the district court lacked jurisdiction over plaintiffs' federal statutory claim.[3]

## STATE LAW CAUSE OF ACTION

██ In addition to the statutory claim, plaintiffs sought relief based on the independent state law claim of tortious interference with an economic relationship. Oregon law recognizes such a tort as applied to an at-will employment contract. *See Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 733 P.2d 430, 433–36 (1987). Under Oregon law, a plaintiff must show that the defendant acted intentionally, *id.* at 621, 733 P.2d at 433, and that

> the interference either [was] in pursuit of an improper or wrongful motive or involve[d] the use of an improper or wrongful means. *Top Service Body Shop v. Allstate Ins. Co.*, ... 283 Or. [201,] 205, 582 P.2d 1365.... [1978]. These motives or means may be defined as improper "by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." [*Id.*] at 209–10 [582 P.2d 1365]....

*Lewis*, 302 Or. at 622, 733 P.2d at 434.

The jury in the present case was instructed in accordance with this Oregon law. The jury was also instructed that even if it found against Santa Fe on both the federal and state law theories, it was required to avoid double recovery by awarding only one set of damages.

Plaintiffs provided sufficient evidence from which a reasonable jury could find that the defendants interfered in Southern Pacific's employment relationships in order to avoid the possible imposition of the New York Dock conditions, which the defendants could have believed would occur if they waited to terminate the plaintiffs until after the merger was approved. Southern Pacific's officials testified that they were aware of the defendants' desire to keep merger transition costs to a minimum. Santa Fe's internal memoranda demonstrate the defendants' awareness of Southern Pacific's proposal to cut back personnel, including the impact of the New York Dock conditions, and Southern Pacific's desire to have the defendants approve it. Santa Fe itself projected the impact of the New York Dock conditions regarding Southern Pacific's personnel, and expressed approval of Southern Pacific's proposed termination plan before that plan went into effect.

The defendants point out that evidence showed that Southern Pacific was the first to spot the possible expense that imposition of the New York Dock conditions would cause, and the first to formulate a plan to deal with it. Yet, the causal link between the defendants' desire to cut costs and Southern Pacific's imposition of a plan to do so is clearly inferable. The evidence demonstrates a willingness on Southern Pacific's part to find ways to comply with the cost-cutting desires of the group that seemed only a regulatory approval away from becoming Southern Pacific's master. The termination plan was put into effect only after the defendants had expressed agreement with it. The evidence was sufficient for the jury to find interference and improper motive on the part of the defendants, thus satisfying the elements of Oregon's tort of intentional interference with economic relationships.

On appeal defendants argue that the ICA preempts plaintiffs' state law claim, maintaining that the claim is based upon an alleged violation of the ICA merger provisions of section 11343, and thus, like the ICA claim, is within the exclusive jurisdiction of the ICC. This contention, however, rests upon the premise that violation of the ICA merger provisions is an essential element of the tortious interference claim. This is not so, and the jury was not so

---

**3.** Because the Supreme Court now treats the existence of a private cause of action as a jurisdictional requirement, *see Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 811–17, 106 S.Ct. 3229, 3234–37, 92 L.Ed.2d 650 (1986), our holding that no private cause of action exists under section 11705 is dispositive of plaintiff's claims that jurisdiction could also be asserted under the federal question statute, 28 U.S.C. § 1331, and the regulation of commerce statute, 28 U.S.C. § 1337.

instructed. The defendants need not have "controlled" Southern Pacific; they need only have wrongfully interfered with plaintiffs' economic relationships. The jury was properly instructed to find for the plaintiffs on this theory only if they found the requisite elements under state law.

■ The defendants on appeal have also raised the possibility that the jury in considering the tortious interference claim was improperly influenced by the existence of the statutory claim, which for jurisdictional reasons now apparent, the district court should not have entertained. Defendants suggest that the jury could have confused the tortious interference claim with the statutory "merger" claim, and that defendants are therefore entitled to a new trial on the tortious interference claim alone. However, the defendants never objected on such grounds to the state law jury instructions. Since the district court had jurisdiction over the state law claim, the defendants' failure to object to the manner in which the jury was instructed regarding it operates as a waiver of such nonjurisdictional claims of error. *See Pierce v. Southern Pac. Transp. Co.*, 823 F.2d 1366, 1371 (9th Cir.1987); Fed.R.Civ.P. 51. Accordingly, we must hold that plaintiffs have waived objection to any prejudicial effect of the statutory claim on the state law tort claim.

■ The defendants also contend on appeal that the punitive damage awards violate the federal constitutional standards of the fourteenth amendment's due process clause and the eighth amendment's excessive fines and punishments clause. The defendants seek to establish as a reasonableness standard the ICA maximum civil penalty limit of $5,000. However, as the defendants themselves have ably demonstrated, plaintiffs had no claim justiciable in federal court for violation of the ICA. Punitive damages in connection with the intentional interference tort are awardable under Oregon state law. *See Lewis*, 302 Or. at 629, 733 P.2d at 438. Under current constitutional standards, the jury's discretion regarding punitive damages is not subject to strict fetters. "Jury discretion over the amounts awarded is limited only by the gentle rule that [punitive damages] not be excessive." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). We see no basis for overturning the punitive damage awards assessed here as excessive in relation to the compensatory damages awarded.

## ATTORNEYS' FEES

The trial court awarded attorneys' fees based on 49 U.S.C. § 11705(d)(3), stemming from the alleged ICA violation. Plaintiffs have never asserted any other basis for attorneys' fees. As we have held that the court lacked jurisdiction over the ICA cause of action, the award of fees predicated on the ICA must be reversed.

## CONCLUSION

The district court's judgment entered in favor of the plaintiffs on the federal statutory claim and the award of attorneys' fees is REVERSED. The judgment of liability and damages in favor of the plaintiffs on the state law tort claim is AFFIRMED.