924 F.2d 961
 RAILWAY LABOR EXECUTIVES' ASSOCIATION; International
Association of Machinists and Aerospace Workers, District
Lodge No. 19; and United Transportation Union, General
Committee of Adjustment GO-887, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION; and United States of
America, Respondents.
 No. 89-70134.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 18, 1990.
Decided Feb. 1, 1991.
 
 Donald F. Griffin, Highsaw & Mahoney, Washington, D.C., for petitioners.
 Lawrence H. Schecker, I.C.C., Washington, D.C., for respondents.
 Guy Vitello, Chicago, Ill., and E. Barrett Prettyman, Jr., Hogan & Hartson, Washington, D.C., for respondents-intervenors.
 Petition for Review of a Decision of the United States Interstate Commerce Commission.
 Before FLETCHER and BEEZER, Circuit Judges, and FITZGERALD, District Judge.*
 BEEZER, Circuit Judge:
 
 
 1
 The Railway Labor Executives' Association ("RLEA"), the International Association of Machinists and Aerospace Workers ("IAM") and the United Transportation Union ("UTU")[1] petition for review of a decision of the Interstate Commerce Commission ("ICC" or "Commission") declining to impose protective conditions for railway employees under 49 U.S.C. Sec. 11347.[2] We affirm in part and remand to the ICC for further proceedings.
 
 
 2
 * Various facets of this case have been pending before the ICC. Santa Fe Industries ("SFI"), a holding company for the Atchison, Topeka & Santa Fe Railway Company ("ATSF"), agreed in 1983 to consolidate with the Southern Pacific Company ("SPC"), a holding company for the Southern Pacific Transportation Company ("SPT"). SFI and SPC merged to form the Santa Fe Southern Pacific Corporation ("SFSP"). Before SFSP could exercise control over both railroads, it needed to get ICC approval under 49 U.S.C. Sec. 11343. Pending ICC approval of the merger, SFSP placed SPC's stock in SPT in an independent voting trust.
 
 
 3
 In December of 1983, the ICC issued an order prohibiting the merger pending the Commission's review of the voting trust. 2 I.C.C.2d 712, 715 (1986). After examining the trust, the ICC concluded in an unpublished decision that the trust was compatible with ICC regulations.
 
 
 4
 In October of 1986, the ICC denied SFSP's applications to control SPT and to merge SPT with ATSF. Santa Fe Southern Pacific Corp.--Control, 2 I.C.C.2d 709 (1986). The Commission concluded that granting SFSP's applications would have anti-competitive effects. It ordered SFSP to divest itself of either ATSF or SPT, subject to Commission oversight. Id. at 834-36.
 
 
 5
 SFSP decided to sell SPT to Rio Grande Industries ("RGI"), a holding company for the Denver & Rio Grande Western Railroad Co. ("DRGW"). The ICC approved SFSP's divestiture of SPT and RGI's application to control SPT in Rio Grande Industries--Control--SPT Co., 4 I.C.C.2d 834 (1988).
 
 
 6
 In Rio Grande Industries, RLEA petitioned the ICC to impose employee protective conditions under 49 U.S.C. Sec. 11347 for the employees who were adversely affected by actions taken in anticipation of the disapproved SPT-ATSF merger. The ICC declined to impose protective conditions for actions taken by ATSF or SPT. Id. at 955. It first explained that ATSF was not an applicant to the Rio Grande Industries proceeding. The Commission then noted that it provides labor protection under 49 U.S.C. Sec. 11347 only where it approves a merger transaction. It concluded that it lacked authority in the RGI acquisition proceeding to mandate protective conditions for the aborted ATSF-SPT merger for actions taken by ATSF or SPT. Id.
 
 
 7
 However, the Commission agreed to examine in a subsequent proceeding whether employees affected by actions of SFSP in connection with the ATSF-SPT merger should be afforded labor protection. Id. at 955-56. Unlike ATSF and SPT, ICC subjected SFSP to continuing jurisdiction because of SFSP's "control" of SPT through the voting trust. Because it believed that the issue needed further analysis, the ICC invited comments on the extent of its authority to impose protective conditions on employees affected by actions taken by SFSP.
 
 
 8
 The Commission received comments from RLEA, SPT and SFSP. In the decision under review in this case, the Commission declined to impose labor protective conditions. The ICC concluded that it lacked authority to impose protective conditions under 49 U.S.C. Sec. 11347 because it had not approved the ATSF-SPT merger. It explained that employees affected by actions taken by ATSF or SPT could resort to grievance procedures in collective bargaining agreements. Employees who were affected by actions taken by SFSP, the Commission contended, could institute civil actions under 49 U.S.C. Sec. 11705.
 
 
 9
 In a related case, this court addressed the claims of SPT employees against ATSF and SFSP arising under the Interstate Commerce Act ("ICA") and Oregon's law of tortious interference with an economic relationship. Kraus v. Santa Fe Southern Pacific Corp., 878 F.2d 1193 (9th Cir.1989), cert. dismissed, --- U.S. ----, 110 S.Ct. 1329, 107 L.Ed.2d 850 (1990). In Kraus, we refused to examine the merits of plaintiffs' claim that ATSF unlawfully exercised control over SPT in violation of the ICA. Noting that ICC authority over mergers is exclusive, we held that the district court lacked jurisdiction over plaintiffs' ICA claim. Id. at 1198. We explicitly rejected the reasoning of the ICC decision under review in this case and held that employees affected by decisions of SFSP in connection with the failed ATSF-SPT merger could not file suit in district court under 49 U.S.C. Sec. 11705 alleging unlawful control under 49 U.S.C. Sec. 11343. Id. at 1198 n. 2.
 
 
 10
 RLEA, IAM and UTU petition for review of the ICC's decision refusing to impose protective conditions for employees affected by the disapproved ATSF-SPT merger. The ICC and intervenors SFSP and ATSF argue (1) that IAM and UTU lack standing and that we should transfer this case because venue for RLEA's petition is not proper in this court, and (2) that the ICA does not authorize protective conditions for the railway employees involved in this case.
 
 II
 
 11
 ICC, SFSP and ATSF contend that IAM and UTU lack standing to petition for review of the ICC's decision. Only "part[ies] aggrieved" by an ICC order may petition for review under 28 U.S.C. Sec. 2344.[3] To have standing, petitioners must have been parties to the proceeding under review. Sierra Club v. United States Nuclear Regulatory Commission, 825 F.2d 1356, 1360-61 (9th Cir.1987). Accord Water Transport Association v. I.C.C., 819 F.2d 1189, 1192-93 (D.C.Cir.1987); Packard Elevator v. I.C.C., 808 F.2d 654, 655 (8th Cir.1986), cert. denied sub nom., International Brotherhood of Electrical Workers v. I.C.C., 484 U.S. 828, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987). Because neither IAM nor UTU filed comments with the ICC concerning the Commission's authority to impose labor protective conditions in this case, the ICC and the intervenors contend that IAM and UTU lack standing.
 
 
 12
 Petitioners IAM and UTU claim that they were parties to the agency proceeding under review. The ICC docketed proceedings relating to SFSP's application to control SPT and to merge ATSF with SPT under Finance Docket Number 30400. The ICC's unpublished decision approving the voting trust was denominated Decision No. 2 under main docket number 30400. The ICC decision under review here was docketed under 30400 as Sub-No. 21.
 
 
 13
 UTU argues that its General Chairman was a party of record to main docket number 30400 and hence a party to all proceedings under that docket number. IAM's General Chairman claims he is similarly listed as a party of record in Subs 8 through 20.
 
 
 14
 Petitioners add that the ICC only solicited comments on its authority to impose protective conditions. It did not ask parties to restate their intention to participate in the proceedings. Because the ICC had requested parties to restate their intention to participate in proceedings in at least one unpublished decision, petitioners ask us to infer that the ICC presumed that the parties in this case would continue to participate in all sub-numbered proceedings. See Blackstone Capital Partners L.P.--Control--CNW Corporation and Chicago and North Western Transportation Co., Finance Docket No. 31493 (Sub-No. 1) (unpublished) (July 5, 1989).
 
 
 15
 We asked the parties to provide supplemental briefing on the standing issue. UTU maintained that it is only fair to assume that parties to lead docket numbers remain parties to all sub-numbered proceedings. The ICC conceded that it sometimes consolidates main docket proceedings with sub-numbered proceedings, treating the consolidated proceeding as one proceeding. The ICC also admitted that its procedures with regard to main docket numbers and sub-numbered proceedings are not codified in agency regulations and are only "accepted internal practices that have been in place for many years." However, the ICC argued that it published notice in the Federal Register asking for comments, and UTU and IAM could have participated if they wanted to comment. The ICC suggested that the UTU should have been aware that the ICC for several years has treated sub-numbered proceedings as completely different proceedings from main docket proceedings.
 
 
 16
 The only Ninth Circuit case addressing the "party" requirement of 28 U.S.C. Sec. 2344 is Sierra Club. In that case, we held that the petitioner lacked standing because it was not a party to the agency proceeding under review and because it did not participate at all in the agency's decision. This case is different because UTU was a party to the main docket number under review and because IAM participated as a party to several sub docket numbers.
 
 
 17
 We conclude that the UTU was a party aggrieved by the Interstate Commerce Commission's order in Santa Fe Southern Pacific Corp.--Control--Southern Pacific Transportation Co., Finance Docket No. 30400 (Sub-No. 21) (January 25, 1989) by virtue of being a party to the main docket number. The ICC's internal practices of differentiating sub-numbered proceedings from main docket proceedings were so cryptic as to make it unfair to penalize a party not aware of the rules. Accordingly, the UTU, as a party to the main docket proceeding, will be considered a party to the sub-numbered proceeding at issue here.
 
 
 18
 IAM, however, may not be considered a party to the relevant sub-numbered proceeding on this basis. That association was a party only to a different individual sub-numbered proceeding, rather than to the main docket proceeding. Accordingly, IAM could not properly have believed itself to be a party to the sub-numbered proceeding at issue here.
 
 
 19
 Because we decide that UTU has standing, we need not decide whether venue is proper in this circuit for RLEA. See Exxon Corp. v. F.T.C., 588 F.2d 895, 898-99 (3d Cir.1978) (in order to avoid a multiplicity of similar suits in different courts, venue need be proper for only one plaintiff under 28 U.S.C. Sec. 1391(e)(4)). Respondents and intervenors do not challenge venue for UTU.
 
 III
 
 20
 RLEA argues that the ICC was required to impose employee protective conditions in this case pursuant to 49 U.S.C. Sec. 11347. Alternatively, RLEA contends that the ICC's decision not to exercise its discretion to impose labor protection was arbitrary and capricious.
 
 A. The Statute
 
 21
 Section 11347 of the ICA requires the ICC to impose labor protection in favor of employees who are affected by transactions "for which approval is sought under sections 11344 and 11345 or section 11346." 49 U.S.C. Sec. 11347 (emphasis added). The ICC's "order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment." Id. (emphasis added). The ICC decided that it had no authority to impose protection for employees affected by the failed ATSF-SPT consolidation because the Commission did not approve the transaction.
 
 
 22
 The Supreme Court has explained that where Congressional intent is ambiguous, courts should defer to a reasonable agency interpretation of a statutory scheme the agency is entrusted to administer. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-845, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). This Circuit upholds an agency's decision "unless it is 'arbitrary, capricious or manifestly contrary to the statute.' " RLEA v. I.C.C., 784 F.2d 959, 964 (9th Cir.1986) (quoting Chevron, 467 U.S. at 844, 104 S.Ct. at 2782).
 
 
 23
 RLEA suggests that the ICC had authority to impose labor protection for the benefit of employees affected by the failed merger because the Commission approved both SFSP's voting trust and SFSP's divestiture of SPT. Section 11347 authorizes labor protection for employees affected by transactions for which approval is sought under section 11344. Section 11344 sets forth approval procedures for transactions enumerated in section 11343.
 
 1. Voting Trust
 
 24
 Section 11343 requires approval for an "acquisition of control of at least two carriers by a person that is not a carrier." 49 U.S.C. Sec. 11343(a)(4) (1988). "Control" includes voting trusts. 49 U.S.C. Sec. 10102(7) (1988). Petitioners argue that when the ICC approved SFSP's voting trust, it approved a transaction under section 11344. They contend that SFSP, a non-carrier, had acquired control of both ATSF and SPT.
 
 
 25
 The ICC and intervenors argue that truly independent voting trusts do not constitute "control" under the ICA. They discuss numerous decisions in which the ICC and courts have explained that the Commission permits independent voting trusts precisely because they ensure that no one exercises unlawful control over carriers. See, e.g., Water Transport Association v. I.C.C., 715 F.2d 581, 582 (D.C.Cir.1983), cert. denied, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 231 (1984). RLEA points to other decisions in which the word "control" is used to describe an independent voting trust. See, e.g., Rio Grande Industries, 4 I.C.C.2d at 955 (Commission twice stated that SFSP controlled SPT through the voting trust).
 
 
 26
 Even if the ICC's approval of the voting trust constituted an approval of a section 11344 transaction, respondents and intervenors argue that the ICC was only required to impose protection for employees affected by that transaction. See 49 U.S.C. Sec. 11347. They maintain that any adverse actions taken by SFSP, SPT or ATSF related to the failed merger and not the voting trust. Petitioners ask this court to consider the voting trust, the merger, and the divestiture as part of one continuous section 11344 transaction. If the Commission had disapproved of the voting trust, then SFSP would have had to divest itself of either ATSF or SPT in order to avoid violating section 11343.
 
 
 27
 We do not think that the voting trust, the merger, and the divestiture are best viewed as sub-parts of one transaction. We think that each is a separate transaction. Furthermore, we agree with respondents and intervenors that any adverse actions taken by them related to the failed merger rather than the voting trust. Accordingly, we do not find the ICC's construction of Sec. 11347 as not mandating imposition of protective conditions on the basis of the voting trust at issue to be arbitrary or capricious.
 
 2. Divestiture
 
 28
 For these same reasons, the ICC's failure to impose protective conditions based on its approval of SFSP's divestiture of SPT was neither arbitrary nor capricious. As stated, any adverse actions taken by SFSP, SPT and ATSF related to the failed merger, not to the divestiture. Accordingly, the ICC properly could determine that Sec. 11347 did not mandate imposition of protective conditions in these circumstances.
 
 B. The ICC's Discretionary Power
 
 29
 Even if labor protective conditions are not statutorily required in this case, petitioners maintain that the ICC had discretionary authority to impose labor protective conditions. See I.C.C. v. RLEA, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904 (1942). Respondents argue that petitioners raised discretionary authority for the first time on appeal. Petitioners maintain that they cited the relevant authority in RLEA's comments to the ICC.
 
 
 30
 RLEA discussed United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), and cited ICC v. RLEA, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904 (1942), in its Comments to the Commission and in its Reply to Comments submitted by SFSP and ATSF. RLEA did not expressly argue that the ICC has discretionary authority to impose labor protections for the benefit of employees. However, RLEA did argue that Lowden and RLEA indicate that the Commission has authority to impose protective conditions. RLEA then contended not only that the Commission had authority to impose protective conditions, but also that the Interstate Commerce Act mandated protective conditions. Because Lowden and RLEA both discuss the Commission's discretionary authority to impose labor protection, RLEA argued that the ICC has discretionary authority in the proceedings before the Commission.
 
 
 31
 The Court in RLEA held that the ICC could impose protective conditions for the benefit of employees when the Commission approved abandonments, even though the statute did not explicitly provide for protective conditions. The Court explained that the Commission had authority to impose the conditions under its statutory power to issue abandonment certificates on conditions required by public convenience. 315 U.S. at 376-377, 62 S.Ct. at 719-20.
 
 
 32
 Petitioners note that the Commission has authority under section 11343 to impose conditions governing the transaction. See 49 U.S.C. Sec. 11344(c). Moreover, the ICC is required to consider the interests of carrier employees. 49 U.S.C. Sec. 11344(b)(1)(D). Petitioners maintain that the Commission had discretionary authority in this case to impose labor protection.
 
 
 33
 Intervenors distinguish the Supreme Court's opinion in RLEA on the ground that the ICC approved the transaction under question in that case. While it is true that the Supreme Court held that the ICC had discretionary authority to impose labor protection when it approved an abandonment, nothing in the Court's opinion suggests that the Commission would lack discretionary authority if it disapproved of the transaction. In this case, the ICC's discretionary authority arises from section 11344(c), which empowers the Commission to "impose conditions governing the transaction." We believe that the ICC had discretionary authority to impose protective conditions. As the ICC did not exercise its discretion in determining whether such labor protection was warranted, we remand to the ICC for proper consideration of this issue.
 
 IV
 
 34
 We hold that UTU has standing, but that IAM lacks standing. We conclude that 49 U.S.C. Sec. 11347 does not require the ICC to impose labor protection for employees in this case. As 49 U.S.C. Sec. 11344(c) gives the Commission discretionary power to impose protective conditions, however, we remand for determination of whether such protection was warranted.
 
 
 35
 AFFIRMED.
 
 
 
 *
 The Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 "Petitioners" will be used to describe the collective position of RLEA, IAM and UTU
 
 
 [2]
 49 U.S.C. Sec. 11347 (1988) provides:
 When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565).... The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission....
 The protective conditions imposed under this section were set out in New York Dock Railway--Control--Brooklyn Eastern District Terminal, 360 I.C.C. 60 (1979), aff'd sub nom., New York Dock Railway v. United States, 609 F.2d 83 (2d Cir.1979). Employers must provide employees with ninety days written notice of a transaction under 49 U.S.C. Sec. 11343. For a period up to six years after a merger, consolidation or other Sec. 11343 transaction, employers must provide employees with the same pay, working conditions, pension rights, and other rights provided for in collective bargaining agreements. For example, if employers transfer employees to lower paying positions, they must pay employees their previous wage. If employers dismiss employees, they must continue to pay their wages adjusted for unemployment benefits and earnings from subsequent jobs. If employees choose to resign, they are entitled to a lump sum payment.
 Employers must give dismissed and displaced employees priority when filling new positions. Employers must also pay to retrain employees for openings which employees are mentally and physically capable of filling, even if the positions are in fields wholly unrelated to an employee's previous position. Employees, however, must accept positions similar to their previous positions which become available after a Sec. 11343 transaction in order to retain benefits. If the new position is in a distant location, employers must pay for moving expenses, and they must reimburse employees who incur losses when selling their homes.
 
 
 [3]
 28 U.S.C. Sec. 2344 (1988) provides in part: "On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies...." (Emphasis added.)