**PEJEPSCOT INDUSTRIAL PARK, INC. d/b/a Grimmel Industries, Plaintiff,**

v.

**MAINE CENTRAL RAILROAD CO., et al., Defendants.**

**No. CIV. 99–112–P–C.**

United States District Court, D. Maine.

Dec. 22, 2003.

James T. Kilbreth, Verrill & Dana, Daniel L. Rosenthal, Verrill & Dana, Rita H. Logan, Verrill & Dana, Portland, ME, for Plaintiff.

Eric L. Hirschhorn, Winston & Strawn, LLP, Washington, DC, Glen L. Porter, Eaton, Peabody, Bradford & Veague, Bangor, ME, for Defendants.

## MEMORANDUM OF DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

GENE CARTER, Senior District Judge.

In its First Amended Complaint (Docket Item No. 21), Plaintiff Pejepscot Industrial Park, Inc. d/b/a Grimmel Industries ("Grimmel") seeks a declaration of ownership rights to a railroad spur (Count I) and an injunction preventing destruction of the spur and interference with Grimmel's right to repair, maintain, and use the spur (Count II). The First Amended Complaint further alleges unlawful refusal to provide rail service, in violation of 49 U.S.C. § 11101 (Count III); breach of duty to Grimmel as third-party beneficiary of the freight easement agreement between Maine Central Railroad Company, Springfield Terminal Railway Company, and the State of Maine (Count IV); breach of contract (Count V); and tortious interference with business advantage and expectancies (Count VI). Defendants Maine Central Railroad Company, Springfield Terminal Railway Company, and Guilford Transportation Industries, Inc. now move to dismiss Counts IV, V, and VI of the First Amended Complaint on the ground that such counts fail to state claims on which relief can be granted. Defendants' Motion to Dismiss State Law Claims (Docket Item No. 45). Defendants assert that each of these counts is preempted by the Interstate Commerce Commission Termination Act of 1995 (the "ICCTA"), Pub.L. No. 104–88, 109 Stat. 803 (1995) (codified at scattered sections of the U.S.C., including §§ 10101–16106 (1997)).

Alternatively, Defendants move to dismiss Count IV because Grimmel is not an intended beneficiary of the freight easement agreement at issue in that count, as well as Count VI on the basis that Grimmel has failed to plead fraud with particularity. For the reasons set forth below, the Court will deny Defendants' motion to dismiss with respect to Count V, but will dismiss Counts IV and VI.

## I. FACTS

Defendant Maine Central Railroad Company ("MEC") is a common carrier providing railroad freight services. First Amended Complaint ¶ 2. Defendant Springfield Terminal Railway ("ST") also provides common carrier freight service by railroad. *Id.* ¶ 3. Defendant Guilford Transportation ("Guilford") owns MEC and ST and is itself a common carrier. *Id.* ¶ 4. The dispute among the parties involves a 3000–foot railroad spur located in Topsham, Maine. In January 1992, Grimmel purchased an abandoned paper mill formerly owned and operated by Pejepscot Paper Company, incorporated as Pejepscot Industrial Park, and engaged in the business of salvaging, selling, and shipping scrap metal. *Id.* ¶ 7. The spur in question runs across Grimmel's land and the adjacent land owned by Eastbrook Timber Company ("Eastbrook") to a main railroad track. *Id.* ¶ 8. Eastbrook has no operations at its site; thus, at this time the spur serves only Grimmel. *Id.* ¶ 9.

The main railroad track to which the spur connects traverses from Brunswick/Topsham to Lewiston and is commonly known as the "Lewiston Industrial Track." *Id.* ¶ 10. MEC's predecessors acquired the track in 1937. *Id.* In February 1991, MEC executed a deed (the "Deed") granting to the State of Maine (the "State") portions of the Lewiston Industrial Track. *Id.* Ex. 1, Ex. A. Among the parcels granted was the Lewiston Lower Road Branch, which lies within Brunswick, Topsham, and Lisbon, Maine and is the portion of the line to which the spur connects. *Id.* ¶ 11 and Ex. 1, Deed Ex. A.

As part of the sale of the Lewiston Industrial Track, MEC, along with ST, entered into a Freight Easement Agreement with the State. *Id.* ¶ 13 and Ex. 2. Pursuant to the Freight Easement Agreement, Defendants reserved "from the Lines conveyed to the State ... a rail freight easement for the purpose of providing common carrier rail freight service to all shippers and shippers' facilities on the Lines." *Id.* ¶ 14 and Ex. 2, § 1.1. Further, the Freight Easement Agreement provides that "[t]he conveyance of the Lines by MEC to the State excludes any and all rights and obligations of the MEC under federal law to provide, directly or through ST, common carrier rail freight service and the MEC retains all such rights and obligations to provide said service to all shippers and shippers' facilities located on the Lines." *Id.* ¶ 14 and Ex. 2, § 1.2.

By 1994, Grimmel's operations were in full swing and Grimmel was prepared to ship scrap metal out of Maine. *Id.* ¶ 15. The most efficient and least expensive method of such shipment is by rail. *Id.* Thus, Grimmel requested that Defendants provide common carrier freight service at Grimmel's Pejepscot Industrial Park. *Id.* Defendants refused to provide service, asserting no appropriate rail cars were available. *Id.* ¶ 16. After shipping the product out of Portland for a time by other means, Grimmel again requested rail service at the Pejepscot industrial facility. *Id.* ¶ 22. Defendants provided Grimmel with rail service rates which Grimmel accepted. *Id.* ¶ 23. Apparently before any product was shipped by rail, Defendants again refused

to provide service to Grimmel. *Id.* ¶ 24. Thereafter, Grimmel began negotiations with the State over repairs to the Lewiston Lower Road Branch track and the provision of rail service to Grimmel upon MEC's formal abandonment of rail service on the Lewiston Industrial Track line. *Id.* ¶ 25.

In June 1998, MEC filed with the Surface Transportation Board (the "STB") a Notice of Exemption for abandonment and discontinuance of service over the Lewiston Industrial Track line. *Id.* ¶ 26 and Ex. 5. In its Notice of Exemption, MEC represented to the Board that the Lewiston Lower Road Branch portion of the line was already owned by the State. *Id.* ¶ 27 and Ex. 5 at 3. It further represented that "the State of Maine, or a third party acting in conjunction therewith, will acquire the remainder of the Line and/or operating rights over the same post-abandonment." *Id.* ¶ 27 and Ex. 5 at 3. MEC maintained that "no salvage operations will be undertaken" after abandonment. *Id.* ¶ 27 and Ex. 5, Ex. D at 4. MEC also represented that "[t]he proposed abandonment will not affect carrier operations in the area." *Id.* ¶ 27 and Ex. 5, Ex. D at 5.

The STB permitted abandonment of the line. *Id.* ¶ 28. Thereafter, Defendants informed Grimmel that they intended to rip up the spur and sell it for scrap. *Id.* Destruction of the spur will entirely cut off Grimmel's ability to obtain rail service from whichever rail carrier operates the main rail line after MEC abandons it. *Id.* ¶ 29. The State of Maine has agreed to upgrade the Lewiston Lower Road Branch so that Grimmel may be provided rail service, so long as Grimmel upgrades the spur. *Id.* ¶ 30. In July 1999, however, after Grimmel had requested MEC's con-

sent to repair and upgrade the spur at Grimmel's own expense, so that Grimmel could have access to rail service on the Lewiston Lower Road Branch, MEC refused to allow Grimmel to repair the spur. *Id.* ¶ 31–32. Thus, Grimmel will be unable to obtain rail service when the main rail line is restored. *Id.* ¶ 32.

## II. Standard

Defendants' motion to dismiss invokes Fed.R.Civ.P. 12(b)(6). "When presented with a motion to dismiss, the district court must take as true the well-pleaded facts as they appear in the complaint, extending the plaintiff every reasonable inference in his favor." *Medina–Claudio v. Rodriguez–Mateo,* 292 F.3d 31, 34 (1st Cir.2002) (citation and internal punctuation omitted). The defendant is entitled to dismissal for failure to state a claim only when "the allegations are such that the plaintiff can prove no set of facts to support the claim for relief." *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 30 (1st Cir.2000) (citation and internal punctuation omitted); *see also Tobin v. University of Maine Sys.,* 59 F.Supp.2d 87, 89 (D.Me.1999). If factual allegations in the complaint are based on documents whose authenticity is not challenged, the court may look to those documents in addition to the complaint itself. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33–34 (1st Cir.2001).

## III. Discussion

■ Count III of the First Amended Complaint is the only count therein grounded upon the ICCTA. The Court previously referred Count III to the STB for a determination of the parties' rights under the primary jurisdiction doctrine.[1]

---

1. The Court referred Count III to the STB pursuant to instructions from the Court of Appeals for the First Circuit, which reversed this Court's holding that it lacked concurrent jurisdiction with the STB over Count III. *See Pejepscot Indus. Park, Inc. v. Maine Cent. R.R.*

The STB concluded that Defendants were obligated to provide a rate for the transportation of automobile shredder residue following a specific request for rates from Grimmel on May 22, 1997.[2] According to the STB, Defendants' failure to provide a rate resulted in a violation of their common carrier obligations under 49 U.S.C. § 11101 shortly after that date, and the violation continued until May 21, 1998, when automobile shredder residue became an exempt commodity under the ICCTA.[3] *Pejepscot Indus. Park, Inc.—Declaratory Order,* STB Finance Docket No. 33989 (STB served November 7, 2003) at 4 (Docket Item No. 58). Defendants filed a cross-petition before the STB seeking an order declaring that federal law preempts the state law remedies sought by Grimmel in Counts IV and VI. The STB declined to rule on the preemption issue because this Court had reserved the matter to itself by only referring Count III to the STB. *Pejepscot Indus. Park, Inc.—Declaratory Order,* STB Finance Docket No. 33989 (STB served May 15, 2003) at 14–15 (Docket Item No. 30). However, in keeping with its helpful practice of bringing potentially relevant STB and ICC precedent to the attention of district courts, the STB noted that it has "in the past determined that a carrier cannot invoke the preemption provisions of 49 U.S.C. 10501(b) to avoid its obligations under a presumably valid and otherwise enforceable agreement that it has entered into voluntarily, where enforcement of the agreement would not unreasonably interfere with interstate commerce." *Id.* at 15. Defendants now urge the Court to dismiss Counts IV, V, and VI on the basis that they are preempted by the ICCTA. Before engaging in its preemption analysis with respect to Counts V and VI, the Court first will discuss Count IV, which must be dismissed on a different ground, thus making the preemption analysis of that count unnecessary.

## A. Count IV

■ In Count IV of the First Amended Complaint, Grimmel alleges that it is a third-party beneficiary of the Freight Easement Agreement between MEC, ST, and the State of Maine. Grimmel further

---

*Co.,* 215 F.3d 195 (1st Cir.2000). As a consequence of its holding, the Court had also held that it lacked supplemental jurisdiction over Grimmel's state law claims. The Court of Appeals remanded the question of supplemental jurisdiction to this Court, but contrary to Grimmel's position, the Court of Appeals did not conclude that the state law claims were not preempted by the ICCTA. Rather, in the Court's view, the Court of Appeals referred the question of preemption (as part of the issue of whether to exercise supplemental jurisdiction over the state law claims) to this Court.

2. The STB served its initial decision in this case on May 15, 2003, in which it found an ICCTA violation with respect to automobile shredder residue. After granting Guilford's petition for reconsideration, the STB served a second decision on November 7, 2003, in which it refined the date on which the violation commenced.

3. The STB concluded that there could be no violations of Defendants' common carrier obligations with respect to steel and scrap iron because both of these materials were exempt commodities during the period of time at issue in this case. Although exemptions bar regulatory relief while in effect, the STB noted that "exemptions, however, do not extinguish the Board's subject matter jurisdiction over such transportation, nor do they activate any common law causes of action relating to common carriage." *Pejepscot Indus. Park, Inc.—Declaratory Order,* STB Finance Docket No. 33989 (STB served May 15, 2003) at footnote 14 (Docket Item No. 30). Accordingly, the STB's decision to exempt a particular commodity does not open the door to state law claims that would otherwise be preempted if the commodity were not exempt.

alleges that Defendants have breached their duties under the agreement and that Grimmel is entitled to recovery as a result. The threshold question, of course, is whether Grimmel is in fact a third-party beneficiary to the Freight Easement Agreement, and the Court looks to Maine law to determine the answer. Maine courts rely on Section 302 of the RESTATEMENT (SECOND) OF CONTRACTS when presented with this question, *see, e.g., F.O. Bailey Co. v. Ledgewood,* 603 A.2d 466, 468 (Me.1992), and Section 302 provides:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Here, the Freight Easement Agreement contains the parties' clear and unmistakable agreement not to create any third-party beneficiaries. Section 9.6 of the Freight Easement Agreement provides that "[t]his Easement Agreement ... except with respect to the Operator [*i.e.,* parties designated by the State of Maine to occupy and conduct transportation operations on the railroad lines covered in the agreement], is not intended to inure to the benefit of any person or entity not a party to this Easement Agreement." [4] First Amended Complaint Ex. 2. Grimmel urges

the Court to look beyond this express contract language to the circumstances surrounding the execution of the Freight Easement Agreement, which Grimmel believes will demonstrate that Grimmel was an intended, rather than incidental, beneficiary of the agreement. However, when the promisor and promisee have otherwise agreed to exclude the possibility of third-party beneficiaries through specific and unambiguous contract language, this Court will not "undertake to find another contrary intent." *Inhabitants of City of Saco v. General Electric Co.,* 779 F.Supp. 186, 194 (D.Me.1991). Accordingly, the Court will dismiss Count IV for failure to state a claim on which relief can be granted.

### B. Counts V and VI

The ICCTA reserves jurisdiction over transportation by rail carrier to the STB as follows:

> (b) The jurisdiction of the Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

---

4. Grimmel does not assert that it falls within the definition of "Operator" as that term is used in the Freight Easement Agreement.

49 U.S.C. § 10501(b). "Congress and the courts long have recognized a need to regulate railroad operations at the federal level." *City of Auburn v. U.S. Gov't,* 154 F.3d 1025, 1029 (9th Cir.1998). Further, "Congress' authority under the Commerce Clause to regulate the railroads is well established." *Id.* (citations omitted). The preemptive effect of the last sentence of section 10501(b) has been examined by a number of courts.[5]

State statutes and local ordinances often do not survive an ICCTA preemption challenge. *See, e.g., Friberg v. Kansas City S. Ry. Co.,* 267 F.3d 439, 444 (5th Cir.2001) (state anti-blocking statute is preempted by ICCTA); *City of Auburn,* 154 F.3d at 1031 (ICCTA preempts state and local environmental review laws as applied to reopening of rail line); *Railroad Ventures, Inc. v. Surface Trans. Bd.,* 299 F.3d 523, 563 (6th Cir.2002) (state statutes permitting townships to regulate land use and requiring them to keep public roads open and free from nuisance are preempted by ICCTA to the extent the laws intrude upon the STB's exclusive jurisdiction over rail transportation); *Cedarapids, Inc. v. Chicago, Cent. & Pac. R.R. Co.,* 265 F.Supp.2d 1005, 1015 (N.D.Iowa 2003) (ICCTA preempts state law providing for reversion of railroad right-of-way after abandonment by railroad); and *Burlington N. Santa Fe Corp. v. Anderson,* 959 F.Supp. 1288, 1296 (D.Mont.1997) (state law authorizing state regulation of closure, consolidation, or centralization of railroad agencies is preempted). In the words of one court, "[i]t is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." *CSX Transp. v. Georgia Pub. Serv.*

*Comm.,* 944 F.Supp. 1573, 1581 (N.D.Ga. 1996).

Likewise, courts regularly have found that the ICCTA preempts state common law claims with respect to railroad operations. *See, e.g., Friberg,* 267 F.3d at 444 (ICCTA preempts claims of negligence and negligence per se with respect to railroad's alleged road blockages); *Guckenberg v. Wisconsin Cent. Ltd.,* 178 F.Supp.2d 954, 958 (E.D.Wis.2001) (state law nuisance claim with respect to railway traffic is preempted); *Rushing v. Kansas City S. Ry. Co.,* 194 F.Supp.2d 493, 500–01 (S.D.Miss.2001) (ICCTA preempts state law nuisance and negligence claims intended to interfere with railroad's operation of switchyard); *South Dakota R.R. Auth. v. Burlington N. & Santa Fe Ry. Co.,* 280 F.Supp.2d 919, 934–35 (D.S.D.2003) (state law claims for punitive damages and tortious interference are preempted by ICCTA). According to the *Guckenberg* court, a state may regulate through an award of damages under a common law claim as effectively as it may regulate by some form of preventative relief, and thus a state common law cause of action may qualify as "regulation" for purposes of section 10501(b). *Guckenberg,* 178 F.Supp.2d at 958. *See also Friberg,* 267 F.3d at 444 (ICCTA preemption clause does not permit ICCTA "to be circumvented by allowing liability to accrue under state common law, where that liability arises from a railroad's economic decisions.")

In addressing Count V, the Court has the benefit of the STB's analysis in *Township of Woodbridge v. Consolidated Rail Corp.,* STB Docket No. 42053 (STB served December 1, 2000), *clarified* (STB served

---

**5.** The Court notes that the Court of Appeals for the First Circuit has acknowledged the breadth of the ICCTA's preemptive reach in its decision on appeal. *Pejepscot Indus. Park,* 215 F.3d at 202 ("The last sentence of

§ 10501(b) plainly preempts state law.") However, the Court of Appeals did not rule on the preemption issue as it applies to Grimmel's state law claims, but rather left the analysis to this Court.

March 23, 2001), *available at* 256 F.3d 718 and 2001 WL 283507, *respectively.* In its initial decision, the STB concluded that a rail carrier that voluntarily enters into an otherwise valid and enforceable agreement cannot use the preemptive effect of section 10501(b) to shield it from its own commitments, provided that the agreement does not unreasonably interfere with interstate commerce. 256 F.3d 718, 721–23. In clarifying that earlier decision, the STB subsequently noted that a rail carrier that enters into such agreements is not precluded from arguing "as a matter of contract interpretation that: (1) unreasonable interference with interstate commerce would result if these voluntary agreements are interpreted [in the manner sought by the plaintiff], and (2) in considering enforcement, the court should give due regard to the impact on interstate commerce." 2001 WL 283507 at *2.

■ Grimmel urges the Court to adopt the STB's reasoning with respect to the preemptive effect of section 10501(b) on voluntary contracts, and the Court elects to do so. In Count V, Grimmel alleges that Defendants have breached a contract into which they have voluntarily entered with respect to the rail transportation of materials from the Pejepscot Industrial Park, and Grimmel should have the opportunity to establish that such a contract was formed and that Defendants have breached it.[6] To the extent that Defendants have in fact entered into such a contract, they cannot hide behind the shield of section 10501(b) to avoid their commitments, and the Court will therefore deny Guilford's motion to dismiss with re-

spect to Count V.[7] However, to the extent that Grimmel's First Amended Complaint can be read to seek exemplary damages with respect to Count V, the Court holds that such a claim for exemplary damages is preempted by the ICCTA. *See South Dakota R.R. Auth.,* 280 F.Supp.2d at 934 ("The power to punish with huge monetary penalties is the most stringent 'regulation' possible.")

■ With respect to Count VI (tortious interference), this Court joins other courts in recognizing that awards of damages pursuant to state tort claims may qualify as state "regulation" when applied to restrict or burden a rail carrier's operations. Grimmel cites to *Kraus v. Santa Fe Southern Pacific Corp.,* 878 F.2d 1193 (9th Cir. 1989), in support of its argument that Count VI is not preempted. In *Kraus,* the plaintiffs brought claims of tortious interference with an economic relationship based on the defendant's alleged interference with their employment relationships, which was allegedly motivated by the defendants' desire to avoid difficulties under the Interstate Commerce Act's merger provisions. *Id.* at 1197. The court concluded that the plaintiffs' tortious interference claims were not preempted because the violation of the Interstate Commerce Act's merger provisions was not an essential element of the tortious interference claim. *Id.* at 1199–1200. In the instant case, the alleged interference centers around rail transportation itself, and awards of damages in these circumstances may serve to impermissibly regulate rail transportation. *See South Dakota R.R.*

---

6. Likewise, Defendants will have the opportunity to assert that any such contract, as interpreted by Grimmel, is unreasonably burdensome to interstate commerce.

7. Defendants urge the Court to construe Grimmel's allegations under Count V narrow-

ly to involve only a breach of contract with respect to automobile shredder residue, *i.e.,* a breach of contract claim that completely overlaps with Grimmel's claim under the ICCTA (Count III). The Court declines to do so at this stage of the proceedings.

*Auth.*, 280 F.Supp.2d at 934 (finding that economic recoveries through tort claims could impact rates, routes, and services). Therefore, the Court concludes that Count VI is preempted by the ICCTA.[8]

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss State Law Claims be, and it is hereby, **DENIED** with respect to Count V and **GRANTED** with respect to Counts IV and VI.

Arthur Harvey, pro se, Canton, ME, for Plaintiff.

Halsey B. Frank, Office of the U.S. Attorney, Portland, ME, for Defendant.

---

8. In so holding, it is unnecessary for the Court to reach Defendants' argument that Grimmel failed to plead fraud with particularity in Count VI.